# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| MICHAEL SPLAINE, Derivatively on Behalf of Nominal Defendant CARDINAL HEALTH, INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID J. ANDERSON, COLLEEN F. ARNOLD, GEORGE S. BARRETT, CARRIE S. COX, CALVIN DARDEN, BRUCE L. DOWNEY, PATRICIA A. HEMINGWAY HALL, AKHIL JOHRI, CLAYTON M. JONES, MICHAEL C. KAUFMANN, GREGORY B. KENNY, NANCY KILLEFER, DAVID P. KING, and J. MICHAEL LOSH, <br><br> Defendants, <br><br> and <br><br> CARDINAL HEALTH, INC., <br><br> Nominal Defendant. | Case No. 2:20-cv-203 <br><br> Judge <br><br> Magistrate Judge <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

<b>Page</b>

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 6

III.    PARTIES ............................................................................................................. 7

     A.    Plaintiff ..................................................................................................... 7

     B.    Nominal Defendant Cardinal Health ........................................................ 7

     C.    Individual Defendants ............................................................................... 7

     D.    Non-Parties ............................................................................................. 11

IV.     STATEMENT OF FACTS ................................................................................ 12

     A.    Overview of the Company ...................................................................... 12

     B.    The Company's Positive Obligations under the CSA and State Law
         Analogs .................................................................................................. 12

     C.    The Opioid Crisis ................................................................................... 15

     D.    The Individual Defendants Are Responsible For Protecting Cardinal
         Health and Ensuring that the Company Complies with the CSA and Its
         State Analogs .......................................................................................... 16

     E.    The Board Has Passively Responded to Repeated Red Flags of CSA
         Compliance Failures .............................................................................. 21

          1.    2005–2008: The Company's Woeful Anti-Diversion Controls and
              Suspicious Order Monitoring Practices Culminate in the 2008
              Settlement ................................................................................... 21

          2.    2008–2012: Cardinal Health Directors Continue to Passively
              Receive Reports of Cardinal Health's Ongoing Failures to Comply
              with the CSA and the 2008 Settlement ...................................... 27

          3.    2012: Cardinal Health's Ongoing Compliance Failures Result in
              Another Settlement with the DEA Relating to the Same
              Misconduct as the 2008 Settlement .......................................... 29

          4.    2012–2016: Despite Cardinal Health Being a Repeat Offender, the
              Individual Defendants Continue to Disregard the Positive
              Obligations Imposed by the CSA and the 2012 Settlement and

Ignore Additional Red Flags Indicating Deficiencies in the Company's Anti-Diversion Program ........................................................ 33

5. 2017–2019: As the Opioid Crisis Reaches a Critical Mass, the Individual Defendants Mount a Misguided "Response" Devoting Inadequate Attention to the Efficacy of the Company's Anti-Diversion Program ..................................................................... 41

F. The Public Record Reveals Pervasive, Ongoing Failures in the Company's Anti-Diversion Program ........................................................................... 56

G. The Individual Defendants Have Caused Significant Harm to Cardinal Health ................................................................................................................ 60

V. DEMAND ON THE BOARD WOULD BE FUTILE ..................................................... 62

COUNT I: AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY ................................................................................................................ 65

COUNT II: AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS ............................................................................................................ 67

PRAYER FOR RELIEF ............................................................................................................... 67

JURY TRIAL DEMANDED ....................................................................................................... 68

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Michael Splaine ("Plaintiff"), by and through the undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Cardinal Health, Inc. ("Cardinal Health" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers (the "Individual Defendants," as defined below) seeking to remedy the Individual Defendants' misconduct alleged herein. Plaintiff makes the allegations within this Complaint based upon his personal knowledge as to himself and with respect to the remainder of the allegations, based upon discussions with and on the reliance of his counsel, including the pre-suit investigation conducted by counsel, which included a review of documents produced by Cardinal Health in response to a demand for books and records under Ohio Revised Code § 1701.37 (the "Books and Records"), the Company's filings with the U.S. Securities and Exchange Commission ("SEC"), conference calls, announcements, press releases, corporate governance documents available on the Company's website, government and regulatory investigations, and other information.

## I.    INTRODUCTION

1.    Cardinal Health operates in the highly regulated pharmaceutical distribution industry and is among the three biggest distributors in the United States of controlled-substance medications, such as opioid-based pain medications. To maintain its ability to distribute controlled substances and continue to act as the middleman in the pharmaceutical product supply chain, as described herein, the Company is required to adhere to positive obligations under federal law to enact compliance systems and internal controls to, among other things, identify suspicious orders of controlled substances and report them to the U.S. Drug Enforcement Administration ("DEA"). The federal regulatory scheme, grounded in the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* (the "CSA"), requires positive action by

pharmaceutical distributors as an integral part of the federal government's efforts to curb illicit trade in legally manufactured medications, like opioid-derived pain medications, that are known to be subject to abuse and cause dependency and addiction. This lawsuit arises from the Board's consistent passivity concerning Cardinal Health's compliance obligations and the Company directors' absence of action, over more than a decade, to monitor Cardinal's internal controls and compliance mechanisms and ensure that the Company adheres to the CSA's requirements for the Company to implement and maintain effective controls against diversion of controlled substances.

2.      A prescription opioid crisis has been raging across United States for nearly two decades, and its foundation was built upon ostensibly legal prescriptions that were diverted into an illegal drug market. Every day, more than 130 people in the United States die after overdosing on opioids and the economic burden of prescription opioid misuse alone in our country is an estimated $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.

3.      Cardinal Health is one of the three main distributors in the pharmaceutical opioid supply chain. Approximately 90% percent of prescription opioids in the Unites States are distributed by Cardinal Health and two other national distributors, McKesson Corporation ("McKesson"), and AmerisourceBergen Corporation ("AmerisourceBergen"). Cardinal Health itself controls 25% of the total market for prescription opioid distribution.

4.      Cardinal Health, like other controlled-substance distributors, is subject to extensive federal and state regulation as a distributor of controlled substances such as prescription opioids. The CSA, for one, requires the Company to maintain "effective control against diversion of particular controlled substances [including opioids] into other than legitimate medical, scientific, and industrial channels," 21 U.S.C § 823(b)(1), to "design and operate a system to identify

suspicious orders [of controlled substances]," 21 U.S.C § 832(a)(1), and to "inform the [DEA]" of such orders. 21 C.F.R. § 1301.74(b). Similar requirements exist at the state level.

5.　　As early as August 2005, in discussions with DEA officials, the Company learned that it was distributing excessive amounts of prescription opioids. Cardinal Health took no corrective action, and the DEA began suspending controlled-substance distribution licenses held by the Company's distribution facilities, including one located in Lakeland, Florida (the "Lakeland Facility").

6.　　In a settlement in 2008 (the "2008 Settlement"), Cardinal Health agreed to pay a $34 million civil penalty for alleged violations of the Company's obligations under the CSA at seven of the Company's distribution facilities. In connection with the 2008 Settlement, Cardinal Health agreed to, among other things: (1) "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations"; and (2) "inform [the] DEA of suspicious orders [as required by the CSA][.]" The DEA noted in a press release that "[d]espite DEA's repeated attempts to educate Cardinal Health on diversion awareness and prevention, Cardinal engaged in a pattern of failing to report blatantly suspicious orders for controlled substances filled by its distribution facilities located throughout the United States[.]" R. Kerry Clark ("Clark"), Chairman and Chief Executive Officer ("CEO") of Cardinal Health at the time, said in a statement about the settlement, "Protecting the integrity of the pharmaceutical supply chain is a responsibility we take very seriously, and preventing prescription drug abuse is a public policy goal that Cardinal Health fully supports[.]"

7.　　On the public relations front, Cardinal Health said all the right things. But, as demonstrated by the Books and Records, the Company's Board and senior executives and officers were more focused on avoiding the DEA enforcement action, and the Board essentially took no

action to ensure the efficacy of the Company's anti-diversion program and the Company's compliance with the CSA and the 2008 Settlement.

8. New DEA investigations followed less than three years after the 2008 Settlement, resulting in another suspension of the Lakeland Facility's distribution license. According to the DEA, "[d]espite the [2008 Settlement], the specific guidance provided to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels . . . ."

9. Cardinal Health initially, and unsuccessfully, fought the DEA's new enforcement actions in court; after losing, the Company settled with the DEA on May 15, 2012. The Company agreed to a two-year suspension of its Lakeland Facility and, while the Company's payment of a civil penalty was held in abeyance, the Company renewed a contractual commitment to maintain effective controls against diversion and report suspicious orders to the DEA (the "2012 Settlement").

10. Despite that Cardinal Health was now a recidivist CSA offender, the Board and Company management continued to fail to meaningfully engage on a positive approach to monitoring and assessing the effectiveness of Cardinal Health's anti-diversion program and ensuring compliance with the CSA, the 2008 Settlement, and now the 2012 Settlement. Instead, the Books and Records reveal that Company directors passively received information from Company management, who occasionally mentioned to the Board and its committees that the Company was working to "continuously improve" the Company's anti-diversion measures, without specificity as to what those improvements entailed or whether they were designed to prevent the compliance failures that led to the 2008 and 2012 Settlements. To the extent the Board

considered its distribution opioid practices, it was myopically focused on the likelihood that the DEA would initiate another enforcement action against the Company.

11.     Meanwhile, the opioid crisis continued to mushroom and additional red flags concerning the effectiveness of the Company's anti-diversion program invaded the public sphere and Cardinal Health's boardroom and C-suites.  Among these, the Company's agreement in 2016 to pay a $44 million penalty to the DEA to resolve allegations relating to the 2012 Settlement (the "2016 Settlement"), lawsuits filed by state and municipal governments against Cardinal Health relating to the Company's role in the opioid crisis, public investigations by a coalition of state attorneys general and reports of two congressional committee investigations describing evidence of long-standing compliance failures at the Company.

12.     The Books and Records reveal that the Board nevertheless continued its established, passive approach to ensuring the Company's compliance with anti-diversion mandates.  While the Board, in early 2018 finally created a Board body—an "Ad-Hoc Committee"—dedicated to addressing the opioid crisis, minutes of meetings of that committee indicate that the Company directors continue to passively receive information and proposals from Company management without actively engaging in their own assessment of the weaknesses of the Company's anti-diversion controls and how to ensure the Company's compliance with the CSA.

13.     Board members of Cardinal Health have a fiduciary obligation to actively monitor the Company's compliance programs and ensure that the Company can continue to engage in the lucrative and important business of a distributor of pharmaceuticals, including controlled-substance medications.  The Books and Records fail to show that the Board members are fulfilling that positive fiduciary obligation.

14. The breaches of fiduciary duty by the Board and the Company's executive officers occurring over the past decade have exposed the Company to potentially *billions of dollars* in losses and expenses, a staggering figure for a company such as Cardinal Health with a market capitalization of approximately $16 billion. This exposure stems from, among other things, (i) compensation paid or that will be paid to states, counties, cities, and independent Native American nations, for the harm inflicted upon them by the Board and senior executives and officers' misconduct, which has already cost the Company $86 million and will likely cost the Company billions more; (ii) substantial regulatory fines totaling at least $78 million; (iii) legal fees relating to civil litigation, and congressional and regulatory investigations; (iv) increased compliance costs; (v) significant lobbying costs aimed at reducing the influence of regulatory entities investigating the Board and senior executives and officers' misconduct and public relations costs aimed at deflecting the same; (vi) waste of Cardinal Health's assets in the form of overcompensating faithless executive officers; and (vii) reputational harm.

15. Plaintiff brings this action to redress the devastating harm that the Board and Cardinal Health senior management have inflicted on the Company through their faithless behavior.

## II.    JURISDICTION AND VENUE

16. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Individual Defendants are citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District because Cardinal Health conducts business and maintains its principal executive offices in this District. Upon information and belief, one or more

of the Individual Defendants resides in this District.  Further, Cardinal Health engages in numerous activities and conducts business here, which had an effect in this District.

## III.    PARTIES

### A.    Plaintiff

18.    Plaintiff is a shareholder of nominal defendant Cardinal Health and has continuously held Cardinal Health stock since at least August 2015.  Plaintiff is a citizen of Maryland.

### B.    Nominal Defendant Cardinal Health

19.    Nominal defendant Cardinal Health is an Ohio Corporation with its principal executive headquarters located at 7000 Cardinal Place, Dublin, Ohio 43017.  Cardinal Health is one of the three largest pharmaceutical distributors in the United States, with over 292 million common shares outstanding as of October 31, 2019.  Shares of Cardinal Health's common stock are publicly-traded on the New York Stock Exchange under the ticker symbol "CAH."

### C.    Individual Defendants

20.    Defendant David J. Anderson ("Anderson") has served as a director of Cardinal Health from 2014 until his resignation from the Board on September 5, 2018.  Anderson served on the Audit Committee from 2014 through 2018.  Anderson is a resident of Connecticut.  Anderson has received $1,061,436 in compensation for his services to the Board.

21.    Defendant Colleen F. Arnold ("Arnold") has served as a director of Cardinal Health since 2007.  Arnold served on the Board's Nominating and Governance Committee from 2010 to 2018 and on the Audit Committee from 2009 through 2010 and became a member again in 2018.  Arnold also served on the Human Resources and Compensation Committee ("Compensation Committee") in 2008.  Arnold is a resident of Maine.  Since 2008, Arnold has received $2,853,926 in compensation for her service on the Board.

22.     Defendant George S. Barrett ("Barrett") served as Chairman of the Board and the Company's CEO from 2009 to November 2017, at which time he served as Executive Chairman of the Board until November 2018.  Barrett received $118,976,686 in compensation for his service as Chairman of the Board and CEO of the Company.

23.     Defendant Carrie S. Cox ("Cox") has served as a director of Cardinal Health since 2009.  Cox served on the Audit Committee from 2010 through 2013.  Cox has served on Compensation Committee since 2014 and on an ad hoc committee formed by the Board in 2018 "to assist the Board in its oversight of opioid-related issues" (the "Ad Hoc Committee") since its formation.  Cox is a resident of New Jersey.  Cox has received $2,403,068 in compensation for her service on the Board.

24.     Defendant Calvin Darden ("Darden") has served as a director of Cardinal Health since 2005.  Darden has served on the Compensation Committee since 2005 and on the Ad Hoc Committee since its formation.  Darden is a resident of Georgia.  Since 2008, Darden has received $2,820,412 in compensation for his service on the Board.

25.     Defendant Bruce L. Downey ("Downey") has served as a director of Cardinal Health since 2009.  Downey has served on the Nominating and Governance Committee since November 2018 and on the Ad Hoc Committee since 2018.  Downey served on the Audit Committee from 2009 through September 2019.  Downey is a resident of Virginia.  Downey has received $2,542,645 in compensation for his service on the Board.

26.     Defendant Patricia A. Hemingway Hall ("Hemingway Hall") has served as a director of Cardinal Health since 2013.  Hemingway Hall has served on Nominating and Governance Committee since 2015 and on the Compensation Committee since November 2018.  Hemingway Hall served on the Audit Committee from November 2013 through 2018.

Hemingway Hall is a resident of Florida. Hemingway Hall has received $1,546,785 in compensation for her service on the Board.

27.     Defendant Akhil Johri ("Johri") has served as a director of Cardinal Health since February 2018, and he has served as a member of the Audit Committee since that time. Johri is a citizen of Connecticut. Johri has received $437,550 in compensation for his service on the Board.

28.     Defendant Clayton M. Jones ("Jones") served as a director of the Company from 2012 through 2018. Jones served as a member of the Compensation Committee from 2013 through 2014 and on the Audit Committee from 2014 through 2018. Jones is a citizen of Florida. Jones received $1,630,822 in compensation for his service on the Board.

29.     Defendant Michael C. Kaufmann ("Kaufmann") has served as a director of Cardinal Health since January 1, 2018 and succeeded Defendant Barrett as CEO of Cardinal Health on that date. Previously, Kaufmann served as Chief Financial Officer ("CFO") of Cardinal Health from November 2014 to December 2017 where, according to the Company's website, "he oversaw all financial activities for the company including external reporting, investor relations, tax strategy/planning, and capital deployment as well as global sourcing for both the Pharmaceutical and Medical segments." Kaufmann served as CEO—Pharmaceutical Segment at Cardinal Health from April 2008 to November 2014 where, according to his LinkedIn profile, he was "[r]esponsible for the direction of an $80 billion Pharmaceutical Segment of Cardinal Health[,]" and "overview the P[rofit]&L[oss] of 16 business units that ranged from pharmacy distribution to nuclear pharmaceuticals[.]" Kaufmann has been with Cardinal Health for almost thirty (30) years where, according to the Company's website, he "has served in a wide range of leadership positions across operations, sales and finance, touching all areas of Cardinal Health" and "was instrumental in orchestrating key activities such as the joint venture with CVS Health that formed Red Oak

Sourcing[.]" Kaufmann is a citizen of Ohio. Kaufmann has received $58,173,701 in compensation for his service on the Board and as an executive officer of the Company.

30. Defendant Gregory B. Kenny ("Kenny") has served as a director of Cardinal Health since 2007, including as its Executive Chairman since November 2018. Kenny has served on the Nominating and Governance Committee since 2009 and on the Ad Hoc Committee since its formation. Kenny served as a member of the Compensation Committee from 2008 through 2014 and as a member of the Audit Committee from August 2007 to November 2007. Kenny is a resident of Ohio. Since 2008, Kenny has received $3,421,159 in compensation for his service on the Board.

31. Defendant Nancy Killefer ("Killefer") has served as a director of Cardinal Health since 2015. She has served on the Compensation Committee since 2015. Killefer is a resident of Washington D.C. Killefer has received $798,225 in compensation for her service on the Board.

32. Defendant David P. King ("King") served as a director of Cardinal Health from 2011 through 2018. King served on the Audit Committee from November 2011 through 2013 and on the Compensation Committee from November 2013 through 2018. King is a citizen of North Carolina. King received $1,954,251 in compensation for his service on the Board.

33. Defendant J. Michael Losh ("Losh") has served as a director of Cardinal Health since December 2018 and previously served on the Board from 1996 to 2009. Losh served on the Audit Committee in 2008 and again in 2018 when he rejoined the Board. Losh is a resident of Michigan. Losh has received $685,524 in compensation for his service on the Board.

34. The following chart summarizes the Individual Defendants' membership on the Board's committees from 2008 to 2018:

| Defendant | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Anderson | | | | | | | A | A | A | A | A |
| Arnold | C | A | A, G | G | G | G | G | G | G | G | A, G |
| Barrett | | | | | | | | | | | |
| Cox | | | A | A | A | A | C | C | C | C | C, O |
| Darden | C | C | C | C | C | C | C | C | C | C | C, O |
| Downey | | A | A | A | A | A | A | A | A | A | A, G, O |
| Hemingway Hall | | | | | | A | A | A | A, G | A, G | A, G, C |
| Johri | | | | | | | | | | | A |
| Jones | | | | | | C | A | A | A | A | A |
| Kaufmann | | | | | | | | | | | |
| Kenny | C | C, G | C, G | C, G | C, G | C, G | C, G | G | G | G | G, O |
| Killefer | | | | | | | | C | C | C | C |
| King | | | | A | A | A | C | C | C | C | C |
| Losh | A, G | | | | | | | | | | A |

A: Audit; C: Compensation; G: Governance; O: Ad Hoc

35.     Anderson, Arnold, Barrett, Cox, Darden, Downey, Hemingway Hall, Johri, Jones, Kaufmann, Kenny, Killefer, King, and Losh are collectively referred to as the "Individual Defendants."

**D.     Non-Parties**

36.     Non-party Dean A. Scarborough ("Scarborough") has served as a director of Cardinal Health since September 2019.

37.     Non-party John H. Weiland ("Weiland") has served as a director of Cardinal Health since September 2019.

## IV.    STATEMENT OF FACTS

### A.    Overview of the Company

38.    Cardinal Health is a global integrated healthcare services and products company servicing pharmacies, hospitals, healthcare systems, ambulatory surgery centers, clinical laboratories, and physician offices.  Cardinal Health is the sixteenth largest company in the United States with fiscal year 2018 revenues of approximately $136.8 billion.

39.    Cardinal Health manages its business and reports its financial results in two segments: Pharmaceutical and Medical.  The Pharmaceutical segment distributes branded and generic pharmaceutical, specialty pharmaceutical, and over-the-counter healthcare and consumer products in the United States.  Among the pharmaceuticals distributed by Cardinal Health are opiates used for pain management.  The Medical segment manufactures, sources, and distributes Cardinal Health branded medical, surgical and laboratory products, which are sold in the United States, Canada, Europe, Asia, and other markets.

40.    At all relevant times, the Pharmaceutical segment constituted the bulk of the Company's revenue.  The following chart provides a breakdown of the Company's revenue by segment from 2008 through 2018:

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pharmaceutical** | 90.9% | 91.5% | 91.1% | 91.3% | 91.0% | 90.0% | 87.9% | 88.8% | 89.7% | 89.5% | 88.6% |
| **Medical** | 9.0% | 8.4% | 8.8% | 8.6% | 8.9% | 9.9% | 12.0% | 11.1% | 10.2% | 10.4% | 11.3% |
| **Total revenue (in millions)** | 87,415 | 96,022 | 98,540 | 102,666 | 107,567 | 101,157 | 91,072 | 102,511 | 121,561 | 129,987 | 136,822 |

### B.    The Company's Positive Obligations under the CSA and State Law Analogs

41.    Wholesale drug distributors, including Cardinal Health, purchase pharmaceuticals from manufacturers and distributes those drugs downstream to pharmacies where they are

dispensed to patients. Cardinal Health distributes these medicines through a network of distribution centers in the United States.

42. Federal and state agencies regulate wholesale pharmaceutical distributors. A primary statute within this regulatory regime is the CSA, which governs the sale, packaging, storage, and distribution of controlled substances. The CSA aims to conquer drug abuse and control the legitimate and illegitimate trafficking of controlled substances. To prevent the diversion of drugs from legitimate to illicit channels, Congress prohibited the manufacture, distribution, dispensing, or possession of any controlled substance except in a manner that the CSA prescribes.

43. The CSA divides drugs and other substances its controls into five schedules, primarily based on whether they have a currently accepted medical use in the United States and their relative potential for abuse and dependence.

44. Certain pharmaceutical opioids distributed by Cardinal Health, such as hydrocodone and oxycodone, are listed as Schedule II Controlled Substances under the CSA. According to the DEA, "[s]ubstances in this schedule have a high potential for abuse, which may lead to severe psychological or physical dependence."[1]

45. The CSA requires wholesale drug distributors to register with the DEA.

46. The CSA requires distributors to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." Additionally, distributors must "design and operate a system to disclose suspicious

_____

[1] Schedule II Controlled Substances have the second highest potential for abuse behind Schedule I Controlled Substances, such as heroin and marijuana, which "have no currently accepted medical use in the United States, a lack of accepted safety for use under medical supervision, and a high potential for abuse."

orders of controlled substances." The CSA also requires distributors to report suspicious orders of controlled substances to the DEA when they are discovered. According to the statute, "[s]uspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Distributors also have a statutory obligation to exercise due diligence to avoid filling suspicious orders that might be diverted to non-medical, scientific, or industrial channels.

47. The CSA empowers the DEA to deny, revoke, or suspend a distributor's registration if the DEA determines the distributor's actions violate the CSA or are inconsistent with the public interest. The DEA has revoked or suspended distributors' DEA registrations for failure to conduct adequate due diligence to avoid filling suspicious orders.

48. Distributors like Cardinal Health must also comply with state requirements relating to controlled substances that may differ from state to state.

49. At all relevant times, the Individual Defendants were aware that the Company operated in a "highly regulated" environment. The Company's Annual Report on Form 10-K for fiscal year 2008[2] contains the following risk factor:

> ***Failure to comply with existing and future regulatory requirements, including DEA operating and security standards, could adversely affect the Company's results of operations and financial condition.***
>
> The healthcare industry is highly regulated. The Company is subject to various local, state, federal, foreign and transnational laws and regulations, which include the operating and security standards of the DEA, the FDA, the NRC, HHS, various state boards of pharmacy, state health departments, the European Union member states and other comparable agencies. Certain of the Company's subsidiaries may be required to register for permits and/or licenses with, and comply with operating and security standards of, the DEA, the FDA, the NRC, HHS and various state boards of pharmacy, state health departments and/or comparable state agencies as well as foreign agencies and certain accrediting bodies depending upon the type of operations and location of product distribution, manufacturing and sale.

---

[2] This document was signed by Individual Defendants Arnold, Darden, Kenny, and Losh.

Similar language appears in every Form 10-K filed by Cardinal Health thereafter. Each document is signed by the full Board.

### C. The Opioid Crisis

50.     Derived from poppy plants, opiates are not new, and their potential for abuse and dependence have been known for centuries. The development of new opioid-based pain medications and their spread into the nation's communities came in large part from the pharmaceutical industry's determination to market their new products for maximum profits. At key moments, distributors, including Cardinal Health, pushed the crisis along.

51.     Rather than being a less addictive pain medication as companies promised and advertised, the new class of opioids has proved dangerously addictive. Working in lockstep together, manufacturers and distributors, including Cardinal Health, aggressively marketed and distributed these medications to pharmacies, doctors, and patients in the pursuit of maximum profit.

52.     The opioid crisis has inflicted a tremendous toll. It has driven down the average life expectancy in the United States. It costs every state in the tens or hundreds of millions of dollars every year in healthcare costs, rehab costs, and increased law enforcement costs. It has destroyed lives and whole families, often beginning with an innocuous prescription after a medical procedure, but ending in a large trade of diverted prescription opioids, and from there often to illegal street drugs. Every year, more than 47,000 people die from opioid-related overdoses.

53.     The opioid crisis has been particularly hard-felt in the State of Ohio. In 2017, Ohio had the second highest rate of drug overdose deaths involving opioids in the United States. That year, there were 4,293 reported deaths—a rate of 39.2 deaths per 100,000 persons, compared to the average national rate of 14.6 deaths per 100,000 persons. In 2011, prescription opioids were the main underlying cause of overdose deaths in Ohio, with a total of 710 deaths reported that year.

The number of deaths continued to grow and by 2017 prescription drugs accounted for 947 reported deaths.

54.     In 2017, Ohio providers wrote 63.5 opioid prescriptions for every 100 persons compared to the average U.S. rate of 58.7 prescriptions.  The rate of overdose deaths involving opioid prescriptions rose steadily from 0.7 deaths per 100,000 persons in 1999 to a peak of 8.4 deaths per 100,000 persons in 2017.

55.     According to a 2017 study conducted by the Ohio State University ("OSU"), the opioid crisis costs Ohio between $6.6 billion to $8.8 billion per year—about the same amount the state spends annually on K-12 education.  And despite the increase in treatment needs for afflicted individuals, the state only has the capacity to treat 20% to 40% of the 92,000 to 170,000 individuals abusing and/or addicted to opioids.

**D.     The Individual Defendants Are Responsible For Protecting Cardinal Health and Ensuring that the Company Complies with the CSA and Its State Analogs**

56.     The Individual Defendants, as directors and/or officers of Cardinal Health, owe or owed fiduciary duties to the Company during their tenures.  Section 1701.59(B) of the Ohio General Corporation Law (the "OGCL") imposes fiduciary obligations on directors of Ohio corporations such as Cardinal Health.  Specifically, Section 1701.59(B) provides that:

> A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  A director serving on a committee of directors is acting as a director.

Section 1701.641(B) of the OGCL imposes similar fiduciary obligations on officers.

57.     By reason of their positions as officers, directors, and fiduciaries of Cardinal Health and because of their ability to control the business and corporate affairs of Cardinal Health and its

subsidiaries, Individual Defendants owed Cardinal Health and its shareholders fiduciary obligations of care, good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cardinal Health in a fair, just, honest, and equitable manner. Individual Defendants were and are required to act in furtherance of the best interests of Cardinal Health and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Cardinal Health and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

58. To fulfill their responsibilities and duties, the directors and officers of Cardinal Health must supervise and manage Cardinal Health's policies, controls, and compliance with applicable controlling statutes. Cardinal Health's directors are each made aware of their duties and responsibilities when, as new Board members, they are required to undergo training and education on fiduciary obligations.

59. In addition to these fiduciary duties, the oversight and management obligations of the Company's directors and officers require them to know of and oversee compliance with various laws and regulations that apply to Cardinal Health's business. Because Cardinal Health's ability to distribute controlled substances and participate in that lucrative and integral aspect of the supply chain depends on the Company's adherence to the CSA's requirements, the Company's directors have a positive fiduciary obligation to oversee and monitor the Company's compliance programs and other internal controls, in order to ensure that the Company is effectively guarding against known compliance risks.

60. Cardinal Health has delineated the roles of its officers and directors in compliance with its Corporate Governance Guidelines (the "Guidelines"), charters of Board committees, and other documents.

61. Since 2003, Cardinal Health has maintained the Guidelines setting forth the role and functions of the Board. The current version of the Guidelines provides:

> The Board, operating directly and through its committees, fulfills the following primary functions:
>
> • Oversee management in the conduct of Cardinal Health's businesses;
>
> • Oversee management's efforts to establish and maintain for the Company high standards of legal and ethical conduct in all of its businesses, including conformity with all applicable laws and regulations;
>
> . . . .
>
> • Oversee management's efforts to protect the assets of Cardinal Health through the maintenance of appropriate accounting, financial reporting and financial and other controls;
>
> • Oversee the Company's policies and procedures for assessing and managing risk; [and]
>
> • Provide advice and counsel to senior management . . . .

62. Until the formation of the Ad Hoc Committee in 2018, the Audit Committee primarily "assisted" the Board in managing the Company's regulatory compliance and risk management processes. No other Board body has any explicit regulatory compliance function. According to its current version of the Audit Committee's charter (the "Audit Committee Charter"), the Audit Committee should, among other things, "assist the Board in monitoring . . . the Company's ethics and compliance program and compliance with legal and regulatory requirements [and] the Company's processes for assessing and managing risk" and "encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels and should provide an open avenue of communication among the

independent auditor, financial and executive management, the internal audit department and the Board . . . ."

63.     The Audit Committee Charter further provides that the Audit Committee shall meet "not less [] than quarterly" and that "[t]he Chair of the Audit Committee or his or her designee shall make regular reports to the Board on behalf of the Audit Committee. The Audit Committee shall annually review the Audit Committee's own performance and the adequacy of the Audit Committee Charter."

64.     In a section entitled "Oversight of Ethics and Compliance" and "Other Matters," the Audit Committee Charter obligates the Committee to, among other things:

        A.      "Approve the appointment and replacement of the Chief Legal and Compliance Officer";

        B.      "Review quarterly reports from the Chief Legal and Compliance Officer regarding the Company's ethics and compliance program, including matters involving possible significant non-compliance with applicable legal requirements and the Company's Standards of Business Conduct by employees of the Company and its subsidiary/foreign affiliated entities."

        C.      "Discuss with the Company's internal counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies and internal controls."

        D.      "Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's financial risk assessment and financial risk management policies."

E.      "[O]versee the Company's process for assessing and managing risk through the Company's Enterprise Risk Management program ['ERM']."[3]

65.     At all relevant times, the Compensation Committee effectuated the Board's compensation responsibilities with respect to Section 16 officers (as defined in Rule 16a-1 issued under the Securities Exchange Act of 1934).  The Compensation Committee's charter delineates various duties and responsibilities for the Compensation Committee which include, but are not limited to, the obligations to: "[a]nnually review and approve corporate goals and objectives relevant to the [CEO's] compensation, evaluate the CEO's performance in light of those goals and objectives, and determine and approve the CEO's compensation level based on this evaluation"; and "[r]eview and approve compensation for the Company's Section 16 officers (other than the CEO) and oversee their evaluations."

---

[3] The Company first mentions the ERM in its 2010 proxy statement, which describes the system as follows:

> The Board is responsible for overseeing our policies and procedures for assessing and managing risk.  In turn, management is responsible for assessing and managing our exposures to risk on a day-to-day basis, including the creation of appropriate risk management policies and procedures. Management also is responsible for bringing to the Board's attention our most significant risks as well as our plans for managing those risks.  To assist the Board and management in exercising the above-described responsibilities, we have developed an enterprise risk management program overseen by our Chief Legal and Compliance Officer, who reports to the Chair of the Audit Committee and to the [CEO] and also is a member of management's senior leadership committee.  Under this program, management is responsible for identifying and prioritizing enterprise risks and developing systems to assess the significance of, and monitor and mitigate, these risks.  Those risks deemed significant at the enterprise level are reviewed and discussed by senior management with the full Board.  Additional review or reporting on additional risks is conducted as needed or as requested by the Board or its committees.  The Audit Committee assists the Board in its oversight responsibilities by overseeing and monitoring our overall risk management processes and major financial and regulatory risk exposures.

**E.     The Board Has Passively Responded to Repeated Red Flags of CSA Compliance Failures**

66.     Despite the Company's positive obligation under the CSA to actively monitor customers and report suspicious orders, the Books and Records reveal a historical pattern of the Board's responding passively to reports from Company management—and Chief Legal and Compliance Officer Craig Morford ("Morford")—of problems with the Company's efforts to monitor and report suspicious orders of controlled substances.  Multiple red flags were raised early and often that Cardinal Health had inadequate processes for identifying and reporting suspicious orders to the DEA and had otherwise failed to maintain effective controls against the diversion of opioids into illegitimate uses. In the face of multiple DEA enforcement actions and resulting settlements, the Board and the other Individual Defendants failed to take appropriate positive action to monitor the Company's anti-diversion controls and ensure that they were and are, in fact, operating effectively.

**1.     2005–2008: The Company's Woeful Anti-Diversion Controls and Suspicious Order Monitoring Practices Culminate in the 2008 Settlement**

67.     From 2005–2007, the DEA initiated and implemented a "Distributor Initiative Program" to educate distributors of prescription medications about the risk of diversion of the most powerful drugs, especially prescription opioids, and the risk that these prescription pills could be used for illicit purposes and end up becoming part of an illegal drug market.  DEA representatives met face-to-face with Cardinal Health's representatives, and the DEA sent at least three letters to all DEA-registered distributors, including Cardinal Health, clearly outlining their legal obligations to investigate, monitor, and report suspicious orders.

68.     Cardinal Health's internal controls to monitor and report suspicious orders soon proved ineffective.  On September 19, 2007, the DEA executed a civil warrant for inspection at

the Company's Stafford, Texas distribution facility (the "Stafford Facility") located in the Houston metropolitan area to collect documents and information relating to the Company's distribution of hydrocodone, a prescription opioid, to Houston-area retail pharmacies, as well as nationally. The Books and Records reflect that the Audit Committee was apprised of the civil warrant in documents dated October 12, 2007.

69.     Less than two months later, on November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension of Registration for the Company's Auburn, Washington distribution facility (the "Auburn Facility") immediately suspending the center's DEA registration because it "constitute[d] an imminent danger to the public health and safety" (the "2007 Auburn Order"). The 2007 Auburn Order expressly asserted that "[r]espondent has failed to maintain effective controls against diversion of a particular controlled substance into other than legitimate medical, scientific and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1)." The DEA issued similar Orders to Show Cause and Immediate Suspension of Registration for the Company's Lakeland Facility and Swedesboro, New Jersey distribution facility (the "Swedesboro Facility") on December 5, 2007, and December 7, 2007, respectively.

70.     The minutes from a Special Meeting of the Board held on December 12, 2007, reflect that the Company's Chief Legal Officer and Secretary Evan K. Fong ("Fong") "explained the recent actions by the [DEA] relating to Orders to Show Cause and Immediate Suspension at three of the Company's distribution centers."

71.     On December 13, 2007, former Cardinal Health Chairman and CEO Clark, Company CFO Jeff Henderson ("Henderson") and Fong met with the DEA. Following that meeting, the Company purportedly authorized "outside counsel and their retained anti-diversion experts to conduct an expansive review of the historic and current anti-diversion practices at all of

the Company's distribution facilities." Cardinal Health also purportedly began certain enhancements to its anti-diversion and suspicious order monitoring program, including the "implementat[ion] [of] a computerized order monitor and control system . . . ." The Audit Committee was apprised of this information in a report on lawsuits and claims dated January 14, 2008.

72.     There is no indication in the Books and Records that the Board took positive action in response to these DEA enforcement proceedings to ensure remediation and the implementation of effective controls.  Rather, the Board was concerned primarily on the business disruptions caused by the DEA's enforcement actions.

73.     For instance, the Books and Records reflect that the full Board received a report from Henderson, dated January 23, 2008, in advance of its meeting scheduled for January 31, 2008.  The report focused on the disruptions to Cardinal Health's business caused by the immediate suspension orders, as well as the loss of business from a customer accounting for "about $6M of annual sales" from a "potentially legitimate customer[]" for whom the Company had to temporarily discontinue service and had now switched to McKesson as its distributor.

74.     To be sure, that same report also made clear that Cardinal Health was not doing enough to its anti-diversion practices to satisfy the DEA.  The report provided greater detail about the Company's December 13, 2007 meeting with the DEA wherein, according to Henderson, "it [wa]s clear that the DEA needs to be further convinced that we have taken the necessary measures to fully remediate the problems." The report also stated that the Company representatives "conveyed that the security of the pharma supply chain is among our highest priorities, and [that Cardinal Health] committed to apply all necessary resources to aggressively implementing better procedures to further guard against distribution to pharmacies engaged in diversion." The report

attached an "action plan" identifying various anti-diversion and suspicious order monitoring enhancements the Company had purportedly committed to implement.

75.     Notwithstanding the Company's purported representation to the DEA about Cardinal Health's commitment to anti-diversion, the concluding paragraph of the report made the Company's priorities abundantly clear:

> We are very disappointed by this situation, which has created much pressure on the organization during a time of already heightened stress due to weak business performance.  Although we are still in the process of determining the financial impact of this issue, it will result in additional costs and business disruption as we take remedial action and service customers from alternative sites.

76.     While the Board and management focused on business disruption, the DEA's enforcement activity pressed forward.  On January 25, 2008, the DEA served an administrative subpoena that requested the production of documents relating to Cardinal Health's obligations under the CSA.  On January 30, 2008, the DEA issued yet another Order to Show Cause, this time for the Stafford Facility.  However, the DEA did not move to suspend distribution activities at this facility.  The Books and Records reflect that management again updated the Board in February, advising the Board that the Company had determined to voluntarily suspend distribution to retail customers at the Stafford Facility and telemarketing of controlled substances from the Company's generic pharmaceutical telemarking distribution business, ParMed Pharmaceuticals Inc. ("ParMed"), "until [Cardinal Health] can confirm that our anti-diversion controls at these facilities meet the enhanced standards we are implementing across the rest of our distribution network." Management expressed frustration that the DEA "continue[d] to insist that before [the agency] discuss[es] specifics of a settlement, they need to complete their investigation . . . and have confidence that we are able to identify, block, and report suspicious orders on our own." Management also provided an "Anti-Diversion Progress Update" outlining certain "personnel and

organizational changes," and "enhanced processes and systems" that had been implemented at the Company.

77.     Three months later, management told the Board that the Company was implementing an adequate anti-diversion program.   A presentation prepared by Fong and Henderson in connection with a May 7, 2008 Board meeting that noted the progress made by Cardinal Health on certain "Key Action Items," but also noted several that remained outstanding, such as "Upgrad[ing] SOPs [Standard Operating Procedures]," "Complet[ing] implementation of Suspicious Order Monitoring system," "Fully train[ing] personnel on anti-diversion requirements and Know-Your-Customer policies," and "Enhanc[ing] [distribution center]-level security and in-transit processes[.]"  The presentation stated that Cardinal Health had "[e]stablished standardized criteria to identify excessive purchases and process to investigate for suspicious orders[.]" among other things.

78.     The presentation also marked the first time that the Board was apprised of the January 25, 2008 administrative subpoena issued by the DEA to the Company.  Referencing the subpoena, the presentation stated, among other things, that "DEA has indicated that awareness of all potential issues . . . is a condition of resolution." Notwithstanding the DEA's Distributor Initiative Program, as of May 2008, Cardinal Health had yet to fully implement multiple, key internal controls to identify and monitor suspicious orders.  Still, the Board took no positive action.

79.     In March 2008, the Audit Committee approved the appointment of Morford as the Company's Chief Legal and Compliance Officer.  Morford officially joined the Company on May 5, 2008.  Morford told the Audit Committee and Board in August 2008 in substantively similar presentations that management would implement "a more proactive approach" to compliance while committing to one of the Company's key priorities for 2009, to "[b]ring suspended facilities

back on line as soon as possible" while continuing to roll out the Company's suspicious order monitoring program at chain pharmacies, managed care facilities, and hospitals.

80. On August 7, 2008, Cardinal Health reached an oral agreement in principle with the DEA to resolve the suspensions of the Company's facilities. The Books and Records reflect that the Audit Committee was apprised of this development at a meeting held on August 19, 2008. No Books and Records show the Audit Committee or the Board actively participated in any way in the settlement process.

81. On October 2, 2008, Cardinal Health and the DEA entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement (defined previously as the "2008 Settlement"). The 2008 Settlement was signed by Clark, as Chairman of the Board and CEO of the Company, and Fong, as its CLO and Secretary. The 2008 Settlement applied to Cardinal and all of the Company's twenty-seven (27) DEA-registered distribution facilities. The 2008 Settlement recounts the history of the immediate suspension orders and/or orders to show cause issued to the Company's Auburn, Lakeland, Swedesboro, and Stafford Facilities, and alleges that Cardinal Health failed to maintain effective controls against the diversion of controlled substances at additional distribution centers located in McDonough, Georgia; Valencia, California; and Denver, Colorado.

82. In connection with the 2008 Settlement, Cardinal Health agreed to, among other things: (1) "maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the [CSA] and applicable DEA regulations" which would "include procedures to review orders for controlled substances" and would provide that "[o]rders that exceed established thresholds and criteria will be reviewed by a Cardinal employee trained to detect suspicious orders for the purposes of determining whether (i) such orders should not be

filled and reported to the DEA or (ii) based on a detailed review, the order is for a legitimate purpose and the controlled substances are not likely to be diverted into [illegitimate] channels"; and (2) "inform [the] DEA of suspicious orders [as required by the CSA][.]" The Books and Records reflect that the full Board passively received a report of the 2008 Settlement at a meeting held on November 5, 2008, but otherwise took no action on the subject.

83.     In a press release issued by Cardinal Health announcing the 2008 Settlement, Clark claimed that: "Protecting the integrity of the pharmaceutical supply chain is a responsibility we take very seriously, and preventing prescription drug abuse is a public policy goal that Cardinal Health fully supports[.]" Clark added that "[w]e settled this matter so that we could quickly resume the distribution of these vital medicines to our valued customers, and we will continue to work with the DEA and other supply chain partners to take all necessary steps to keep these powerful drugs out of the wrong hands."

> 2.     **2008–2012: Cardinal Health Directors Continue to Passively Receive Reports of Cardinal Health's Ongoing Failures to Comply with the CSA and the 2008 Settlement**

84.     According to an April 23, 2009 report from Falk to the Audit Committee about lawsuits and claims, "[o]n March 16, 2009, the DEA notified [Cardinal Health] that it considered the compliance review performed at the [Company's] Valencia, California distribution center to be 'unsatisfactory' and that there were grounds to commence administrative proceedings against the facility's DEA license." The report represents that "the DEA asserted that the Valencia facility had failed to: (i) maintain effective controls to prevent the diversion of particular controlled substances; (ii) detect and report suspicious orders of controlled substances; and (iii) meaningfully investigate new or existing customers' legitimate needs to purchase or order controlled substances." The directors were told that, on March 25, 2009, the Company sent the DEA a letter objecting to the findings.

85. The directors passively received this information, and the Books and Records reveal they took no action in response. The directors behaved in an identical manner following reports of ongoing deficiencies from Morford in August 2009, even while Morford brazenly asserted that the Company had "[d]esigned and implemented an effective Suspicious Order Monitoring Program across all classes of trade" and otherwise painted rosy pictures of the Company's compliance efforts therein and in prior reports to the Board and Audit Committee.

86. Morford's representations regarding the Company's compliance with the 2008 Settlement and the adequacy of the Company's anti-diversion and suspicious order monitoring program were inaccurate in this instance, and the Books and Records reveal other instances where Morford's forthrightness with the Board could be reasonably questioned. Nevertheless, Company directors continued to rely on Morford and passively receive his reports of the Company's continuing failures to comply with CSA and DEA mandates concerning the identification and reporting of suspicious orders and other matters related to its supposed anti-diversion program. At the very least, the Books and Records paint a consistent picture of the Board's passive receipt of information rather than the directors' active engagement and monitoring of the effectiveness of the Company's anti-diversion controls.

87. Notwithstanding the Board and Audit Committee's hands-off approach to monitoring and overseeing the efficacy of the Company's anti-diversion program and compliance with the CSA and the 2008 Settlement, Cardinal Health pushed forward with acquisitions of other distributors. On November 18, 2010, Cardinal Health issued a press release announcing its plans to acquire Kinray, Inc. ("Kinray"), a pharmaceutical distributor servicing the New York metropolitan area, for $1.3 billion in cash in a transaction "significantly expand[ed] [the Company's] ability to serve retail independent pharmacies in the northeastern United States."

Cardinal Health closed on the transaction on December 21, 2010. But, the Books and Records reveal that the Audit Committee and Board failed to ensure that Kinray was, in fact, properly integrated, despite knowing of the integration risk. Morford told the Audit Committee in a January 25, 2011 report that "[w]e are developing the Kinray 100 day integration plan, including suspicious order monitoring, *Standards of Business Conduct* and policy and compliance training as appropriate."

88.     The Books and Records reveal that the Board continued through 2011 its pattern of passively receiving information from Morford and taking no action to ensure the Company's compliance with CSA and DEA requirements, despite continuing compliance failures.

### 3.     <u>2012</u>: Cardinal Health's Ongoing Compliance Failures Result in Another Settlement with the DEA Relating to the Same Misconduct as the 2008 Settlement

89.     In October 2011, the DEA issued a warrant for inspection to the Company's Lakeland Facility and collected records relating to the distribution of controlled substances from that facility, including information on particular customers that had purchased the largest amounts of oxycodone from August 2010 through May 2011, including one of the Company's largest customers, CVS Health. The Books and Records reflect that the Board was apprised of this development in the following month, and that the directors passively received the information, but took no action. Otherwise, the directors apparently devoted no time to ensuring the Company's compliance with its obligations under the CSA.

90.     Instead, management and the Board's focus appeared to rest on avoiding another DEA enforcement action. For example, the Books and Records reflect that management told the Board that the DEA was focused on prescription drug abuse and "the DEA's increased focus on distributors and pharmacies, and discussed the Company's anti-diversion activities."

91.     An October 25, 2011 report from Morford provides the Board with a history of the DEA's enforcement efforts.  The report advises on the status of DEA inspections, noting four (4) "observations" from the DEA in fiscal year 2011 and 2012, as well as six (6) DEA observations for Kinray, but mentions neither the causes for these observations nor the steps that the Company was taking to remediate them or otherwise ensure compliance with the CSA and the 2008 Settlement.

92.     The report is one of the few in the Books and Records that provide information on the Company's suspicious order reporting statistics, but the reported data was startling.  The report's discussion of the Company's suspicious order monitoring program touts, among other things, analytics enhancements that "***reduced incidence of flagged events by 2,509, or 37%, when compared to FY10 thanks to the implementation of more accurate detection systems***."  That same report also noted that Cardinal Health only reported *47* suspicious orders to the DEA across all of the Cardinal Health's approximately 30 distribution centers in fiscal year 2011, an increase of only 17 from the prior year.  The report also noted that Cardinal Health had experienced a *40%* decrease in the number of customers blocked from purchasing controlled substances.  In other words, the data revealed that Cardinal Health was effectuating changes to its anti-diversion program that decreased—rather than increased—the flagging and reporting of suspicious orders.

93.     In addition, a November 2, 2011 presentation from Morford and another member of management to the Board noted that the Pharmaceutical Segment's "Biggest Regulatory Risk" was the "DEA['s] Aggressive Posture."

94.     Nevertheless, despite the red flags and calls for action, the Company directors continued to respond passively to management reports of additional DEA subpoenas and other incidents of manifest compliance failures from November 2011 through May 2012.

95.     Accordingly, on February 2, 2012, the DEA issued a second Order to Show Cause and Immediate Suspension for the Lakeland Facility (the "2012 Lakeland Order"). The 2012 Lakeland Order stated that, "[d]espite the [2008 Settlement]," the specific guidance "provided to Cardinal by DEA, and despite the public information readily regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances." The 2012 Lakeland Order contained harrowing accounts of Cardinal Health flooding the State of Florida with millions of doses of prescription opioids, and egregious failures in the Company's anti-diversion program in the wake of the 2008 Settlement. As noted by the DEA, "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted . . ., including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers." The 2012 Lakeland Order also stated that "Cardinal failed to detect and report suspicious orders of oxycodone products by its pharmacy customers," and that "Cardinal's conduct . . . violated the provisions of the [2008 Settlement]."

96.     The Company determined to fight DEA enforcement efforts rather than take action to remediate its inadequate internal anti-diversion controls. The directors watched.

97.     Ultimately, Cardinal Health was unsuccessful in fighting DEA enforcement efforts and reached an agreement with the DEA to settle its renewed investigation into the Lakeland Facility. On May 15, 2012, Cardinal Health and the DEA entered into a Stipulation and Agreement (previously defined as "2012 Settlement"). The 2012 Settlement was signed by Morford on behalf of the Company. The 2012 Settlement applied to the Lakeland Facility and all of the Company's 27 other DEA-registered distribution facilities. The 2012 Settlement recounts the 2008 Settlement,

the immediate suspension orders issued to the Lakeland Facility, and the DEA's filings in its litigation with the Company.

98.    The 2012 Settlement imposed stringent compliance requirements on the Company. As it did in connection with the 2008 Settlement, Cardinal Health agreed to maintain an effective compliance and to report suspicious orders.  However, the Company also agreed to, among other things, (1) conduct site visits of pharmacies to determine whether diversion was occurring; (2) establish "new processes and practices" for order thresholds whereby "two-person concurrence will be required before increasing thresholds for higher volume customers for specific drug classes"; (3) create a "Large Volume-Tactical and Analytical Committee to review and make decisions regarding higher-volume retail and chain pharmacy customers" comprised of Cardinal Health officers; and (4) "enhance existing processes and practices for conducting due diligence reviews of pharmacies, chain and retail . . . ."  The Company also agreed to a continued suspension of the Lakeland Facility that would be lifted by the DEA in May 2014 if Cardinal Health had maintained compliance with the 2012 Settlement.

99.    The directors learned in an August 2012 presentation prepared by Morford, Defendant Kaufmann (who was then serving as CEO of the Pharmaceutical Segment) and the Company's outside counsel at the time, D. Linden Barber ("Barber"), that  the Company's "Post-2007 Anti-Diversion Program" was fundamentally flawed and, among other things, "[f]ocused on reporting those customers we believed were truly suspicious" in an apparent attempt to "[a]void overwhelming DEA by over-reporting orders of interest," and "[v]iewed lack of negative feedback as positive guidance."   Management predicted ongoing regulatory pressure from the DEA concerning anti-diversion measures.  In that same presentation, management touted certain "Key Program Enhancements," including the identification of "four key metrics that drive the DEA

action against distributors," and "[i]nnovative ways to interact and communicate with the DEA," among others.

100. Management continued to provide positive reports to the Board about its anti-diversion program and compliance with the 2012 Settlement. For example, an October 2012 annual quality and regulatory report from Morford to the Audit Committee touting purported "Enhancements" to the Company's anti-diversion program and representing that the Company had satisfied all of the requirements imposed on it in connection with the 2012 Settlement. The presentation also contained a table indicating that the Company flagged 3,020 suspicious orders in fiscal year 2012 as a result of the Company reporting all suspicious orders instead of following "industry practice" on orders "determined to be of interest to the DEA as potential diverters."

101. The Books and Records again demonstrate the directors' passivity in receiving this information and taking no responsive action. As an example, Morford, the author of numerous rosy—and inaccurate—reports to the directors concerning the Company's compliance efforts, continued to be employed as the Company's Chief Legal and Compliance Officer. At no time during this period between the 2008 and 2012 Settlements do the Books and Records indicate that any directors expressed any lack of confidence in Morford's ability to serve effectively as Chief Legal and Compliance Officer.

       **4.**    **2012–2016: Despite Cardinal Health Being a Repeat Offender, the Individual Defendants Continue to Disregard the Positive Obligations Imposed by the CSA and the 2012 Settlement and Ignore Additional Red Flags Indicating Deficiencies in the Company's Anti-Diversion Program**

102. The Books and Records reveal that, much like the period following the 2008 Settlement, the Audit Committee and Board failed to actively monitor and oversee the Company's anti-diversion program as red flags indicating program deficiencies continued to mount after the 2012 Settlement.

103. On June 26, 2012, the Attorney General for the State of West Virginia commenced a lawsuit against Cardinal Health alleging that the Company "distributes various prescription drugs which are closely identified with the prescription drug abuse problem in West Virginia," and "was on notice of the growing epidemic from the abuse of those prescription drugs which it supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia." The West Virginia Attorney General also alleged that "[a]s a major distributor of controlled substances in West Virginia, Cardinal [Health] has supplied controlled substances to rogue drugstores which dispense controlled substances based on bogus prescriptions from unethical physicians who are prescribing controlled substances for illegitimate medical purposes." The Books and Records reflect that the Board was apprised of this lawsuit at a meeting held on June 27, 2012.

104. Management told the Audit Committee in a July 31, 2012 report that the Company was under investigation for unlawful practices occurring in the Baltimore, Maryland area and could expect "a financial penalty for the alleged failures to report suspicious orders [in connection with the DEA's 2012 investigations][.]" The report also revealed that Cardinal Health met on July 17, 2012, with the DEA and the Assistant U.S. Attorney in Baltimore, Maryland "during which we learned, among other things, of the activity of three other U.S. Attorney's offices along similar lines."

105. Nevertheless, directors elected to receive quarterly and annual compliance updates from Morford into 2014 that made very little to no reference to anti-diversion or suspicious order monitoring programs or Company efforts to counter the heightened regulatory risk.

106. The next discussion of the Company's anti-diversion and suspicious order monitoring program came at a meeting of the Board on May 7, 2014, where the minutes reflect

-34-

that Morford made a presentation on, among other things, the "the current regulatory environment"
and the Company's compliance with the 2012 Settlement.  A cover letter from Morford to the
Board, dated April 29, 2014, reminded the Board of the condition in the 2012 Settlement providing
for the DEA to reinstate the Lakeland Facility on May 14, 2014 if the Company was in compliance
with the agreement.  An accompanying presentation represented that the Company was compliant
with that agreement.  The presentation noted the "Current Regulatory Environment" ("DEA
continues to pursue an aggressive enforcement approach toward distributors and chain
pharmacies") and DEA inspection trends, yet only contains a brief description of the Company's
"Antidiversion Efforts Since [2012 Settlement]" that does not address the underlying effectiveness
of the Company's anti-diversion program.  That same month, the AUSAs prosecuting the
Maryland DEA investigation offered to resolve that matter for an amount not to exceed $59.4
million.  Continuing the pattern, the Board passively received this information and took no
responsive action.

107.    The minutes from an August 6, 2014 meeting of the Board reflect that Morford
discussed "controlled substance diversion" in connection with his compliance report.  An
accompanying presentation from Morford dated July 29, 2014 noted that "Controlled Substance
Diversion" was a "Priority Focus Area[]" yet only dedicated one slide to this important issue.  That
slide noted "External Environment" factors, namely, that the "DEA continues an aggressive
enforcement approach," that states were "enhancing licensing of pain clinic requirements and
prescription drug monitoring programs," the litigation brought by the West Virginia Attorney
General which, at that time, had expanded to 13 distributors "alleging under-reporting of
suspicious orders," and "[m]edia and political focus, with multiple bills proposed in Congress and
state legislatures."  The slide also contained a section titled "Responsive Actions" representing

that the Company was conducting audits and gap assessments and enhancing its anti-diversion and suspicious order monitoring program, and monitoring its compliance with the 2012 Settlement, among other things. That section also noted the Company's "educational outreach" to state attorneys' general, boards of pharmacy, "collaborative industry groups," and "to a more limited extent, DEA/DOJ," and the "[m]onitoring prospective legislation and educating legislators on ways to foster collaboration and address the root causes of abuse and diversion."

108.    To be sure, the Audit Committee remained aware of a looming fine in connection with the 2012 DEA investigations during this time period. For example, the minutes for the Audit Committee's October 27, 2014 meeting reflect that the committee discussed, among other things, the "DEA civil fine matter" with Falk. According to a presentation corresponding with an October 27, 2014 Audit Committee meeting, the Company had earmarked a $26.5 million reserve relating to this investigation.

109.    Nonetheless, Cardinal Health's directors' monitoring and oversight of the Company's anti-diversion program continued its passivity and disengagement. The Books and Records reflect that the Audit Committee did not address this topic again until May 5, 2015, when Morford reported only a non-descript "Enterprise Risk Tracking List" referencing possible DEA regulatory action as a risk to the Company.

110.    Meanwhile, Cardinal Health moved forward with its 2015 acquisition of Harvard Drug Group, another distributor, which the Books and Records reflect the Audit Committee and Board knew had deficiencies in its anti-diversion program.

111.    The minutes for the Board's August 5, 2015 meeting reflect that Morford provided an annual compliance report to the Board that discussed, among other things, "the Company's compliance focus on controlled substance diversion," but no written report is contained in the

Books and Records and the minutes reflect no discussion on the effectiveness of the Company's anti-diversion program. The Books and Records reveal that the Audit Committee received an annual compliance update in connection with its November 3, 2015 meeting, noting positive DEA inspections results, but no discussion as to whether the Company's anti-diversion was, in fact, operating effectively.

112.    To be sure, none of the Books and Records from 2015 reflect any action by the Board to ensure the effectiveness of the Company's anti-diversion programs. Instead, the Board continued its passive approach to compliance, relying on the rosy depictions of the Company's anti-diversion program presented by management. Meanwhile, the Audit Committee learned of continuing compliance deficiencies at the Company during this time though an amended complaint in the West Virginia Attorney General action, and it did nothing.

113.    According to the minutes of a May 3, 2016 Audit Committee meeting, Morford provided a quarterly update on ethics and compliance and ERM, "discussing current anti-diversion program controls and enhancements as well as recent engagement with the [DEA]." The directors received the report and took no action.

114.    According to the minutes of an August 5, 2016 Board meeting, Morford and Senior Vice President, Ethics and Compliance Hollis Foust presented an annual compliance report. The production contains two annual compliance reports, one that was presented in the Board's pre-read materials and another that was intended for Board discussion. The former contains three slides dedicated to the Company's anti-diversion program. One slide generally noted the program's "Core Principles," and "Methodology," and another outlined the organizational structure for the Company's anti-diversion team. The third slide generally outline purported "enhancements" to the program, including the development of a "new review process and model for determining risk

and estimating how our rigorous controls will likely impact potential sales to assist the business in assessing economics of new acquisitions and/or new customers." The Board discussion presentation presented no substantive analysis of the effectiveness of the Company's anti-diversion or suspicious order monitoring programs. The Books and Records reveal that the Board took no action upon receiving the reports.

115.    Notwithstanding Morford's rosy report of the Company's anti-diversion and suspicious order monitoring program, red flags continued to proliferate which should have caused the Audit Committee and Board to take action. On October 22, 2016, *The Washington Post* published an article titled "Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control" detailing the concerted efforts of distributors like Cardinal Health to stifle the DEA's enforcement efforts. Among other things, the article reported that in the summer of 2014, lobbying efforts by the pharmaceutical industry intensified in Congress, where former Representatives Tom Marino (R-Pa.) and Marsha Blackburn (R-Tenn.) proposed legislation called the Ensuring Patient Access and Effective Drug Enforcement Act "that critics said would undercut the DEAs ability to hold drug distributors accountable." According to the article, "[t]ogether, McKesson, AmerisourceBergen, Cardinal and the distributors' association, the Healthcare Distribution Alliance, spent $13 million lobbying House and Senate members and their staffs on the legislation and other issues between 2014 and 2016." The legislation eventually passed in 2016, raising the standard for the DEA to obtain immediate suspension orders and orders to show cause (like the ones issued to Cardinal Health in 2007–2008 and 2012) to require that the DEA show an "immediate" rather than "imminent" threat, "a nearly impossible burden to meet against distributors, according to former DEA supervisors and other critics." According to the *Post*, "the new law gives the industry something it has desperately sought: protection from having

its drugs locked up with little notice." *The Washington Post* published a second article on the opioid crisis two days later titled "Red Flags Didn't Halt Flow of Pills to Black Market." The Books and Records reflect that both articles were presented to the full Board in a "First-quarter FY17 IR Briefing Package," dated November 4, 2016.

116.    While Cardinal's directors remained passive observers to the Company's compliance efforts, *The Washington Post*'s reporting prompted action from members of Congress. On October 26, 2016, the slowdown in enforcement actions specifically against pharmaceutical distributors was noted in a letter from Senators Patrick Leahy and Ron Wyden to former U.S. Attorney General Loretta Lynch (the "2016 Senate Letter"). From the year 2011 to the year 2014, civil case filings against distributors, manufacturers, pharmacies, and physicians plummeted from 131 to 40 cases. The 2016 Senate Letter also generally questioned the DEA's enforcement efforts against Cardinal Health.

117.    The decline in enforcement reflected Cardinal Health's strategy, not to ensure compliance with CSA requirements, but rather to apply maximum pressure through lobbying and influence to reduce or eliminate enforcement action by the DEA. *The Washington Post* article reported that wholesale drug distributors were bypassing the DEA's Office of Diversion Control and pressuring higher level officials within the Department of Justice in an effort to reach favorable resolutions on pending cases.

118.    The Books and Records generally corroborate that the Company sought to combat the DEA during this period through legislative lobbying and other means unrelated to compliance.

119.    Meanwhile, news coverage of the opioid crisis continued to intensify. On December 17, 2016, Eric Eyre of the *West Virginia Gazette-Mail* published an article titled "Drug firms poured 780M painkillers into WV amid rise of overdoses" (the "Eyre Article") reporting that

distributors such as Cardinal Health and other distributors had flooded the State of West Virginia with 780 million hydrocodone and oxycodone pills from 2007 through 2012—an amount equivalent to 433 pain pills for every man, woman and child in the state. The Eyre Article reported Cardinal Health, McKesson, and AmerisourceBergen "supplied more than half of all pain pills statewide," and that "[t]he wholesalers and their lawyers fought to keep the sales numbers secret in previous court actions brought by the newspaper."

120. On December 23, 2016, the DOJ announced that Cardinal had entered into another settlement, agreeing to pay $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York by failing to report suspicious orders of controlled substances in those states (previously defined as the "2016 Settlement"). The DOJ press release states, "[a]ccording to the settlement agreement, Cardinal admitted that from January 1, 2009, to May 14, 2012, it failed to report suspicious orders to the DEA as required by the CSA. The settlement also resolves allegations that Cardinal failed to maintain effective controls against diversion."

121. As part of the 2016 Settlement, Cardinal Health agreed to settle claims brought against Kinray (the "Kinray Settlement"), for deficiencies in Kinray's anti-diversion program that persisted after the Company acquired Kinray several years earlier. Kinray agreed to pay a $10 million fine and revise its processes for the handling of controlled substances. In connection with the Kinray Settlement, the DOJ detailed significant failures in Kinray's anti-diversion program led Kinray to report *zero suspicious orders* over a 15-month period.

122. Less than one week later, on December 28, 2016, the judge overseeing the West Virginia Attorney General action announced a settlement to that lawsuit and that Cardinal Health would pay a $20 million fine. As part of the settlement Cardinal Health agreed to promptly alert state authorities when they see suspicious drug orders from pharmacies, something the Company

-40-

had reportedly not done until the West Virginia Attorney General commenced its lawsuit in June 2012.

      **5.**      <u>**2017–2019**</u>**: As the Opioid Crisis Reaches a Critical Mass, the Individual Defendants Mount a Misguided "Response" Devoting Inadequate Attention to the Efficacy of the Company's Anti-Diversion Program**

123.    For directors on the Audit Committee and the Board, it was business as before: (1) passively receiving reports from management members whose reports had proved consistently unreliable in its depictions of the Company's compliance with CSA requirements and the failures leading to the 2012 and 2016 Settlements; and (2) taking no action to actively monitor the effectiveness of the Company's anti-diversion programs.

124.    When the Audit Committee met on February 2, 2017, the minutes reflect discussion on "recent developments in disputes and investigations . . . including West Virginia follow-on controlled substance litigation . . . ." According to the Audit Committee's report to the Board on February 3, 2017, one of the committee's determinations was that "the agreement with the Attorney General of West Virginia to settle a lawsuit with the Company is not a related party transaction." There is no mention in the minutes of any other issue related to the Company's compliance with either CSA requirements or those of the 2008, 2012 and 2016 Settlements.

125.    Pressure from Congress increased. On March 6, 2017, former U.S. Senator Claire McCaskill, then Ranking Member of the U.S. Senate Committee on Homeland Security and Government Affairs, sent a letter to the Inspector General of the DOJ noting, among other things, the decline in DEA enforcement activity that "parallel[ed] an effort by opioid manufacturers, distributors, and their law firms to hire dozens of former top DEA officials," maneuvers which "prompted ethics experts to raise 'serious questions about whether the ability of the diversion division to carry out its mission has been compromised by the pharmaceutical industry.'"

126. Later that month, the Cardinal Health Board received a letter from the International Brotherhood of Teamsters ("Teamsters"), requesting the Board "take immediate, proactive steps to investigate and address company practices that have helped fuel the deadly prescription opioid epidemic . . . ." The Teamsters' letter noted "unsettling parallels" to other big corporate scandals, "including unaccountable executive pay, serious reputational damage, and numerous missed opportunities to get out ahead of the issue." The Teamsters letter requested that the Board immediately take four actions:

- "Establish an independent committee of the board . . . to conduct a top-to-bottom, root-and-branch review of corporate-wide practices regarding sales and distribution of prescription opioids . . . ."

- "Amend the annual and long-term incentive plans to provide that awards include a compliance-based metric . . . ."

- "Investigate whether there is capacity under the company's clawback policy to recoup pay from top executives in light of the compliance challenges and reputational damage related to the company's distribution of prescription opioids . . . ."

- "Commit to establishing an independent chairman . . . ."

127. According to the Books and Records, the Board and Audit Committee continued to address its oversight of the Company's anti-diversion program at only a superficial level, making no effort to determine whether the program was, in fact, operating effectively in the face of many red flags suggesting the contrary. Instead, the Board and Audit Committee were much more focused on damage control.

128. The minutes of a meeting of the Board held April 5–6, 2017, reflect that the Board received a "Legal and Regulatory Update regarding controlled substance matters" from Morford and Corporate Secretary Jessica L. Mayer ("Mayer"). Barber "described the Company's current anti-diversion program and provided his assessment. The rest of the discussion focused on Mayer's review of the "litigation landscape and defense strategy for the Company's controlled

substance litigation in West Virginia," and an update from Morford on "federal and state administrative and legislative activity." Executive Vice President Ellen Barry discussed "the Company's media and stakeholder engagement strategy and activity."

129. An accompanying presentation from Morford and Mayer contains two slides outlining the design of the Company's anti-diversion program and prior, ongoing and planned revisions to the program. The rest of the presentation is dedicated to historical context of the opioid crisis, the litigation landscape and defense strategy, media and stakeholder engagement, and legislative activity. The media and stakeholder engagement section outlined a strategy to "[r]eorient current narrative and correct current record," and an outreach process that involved, among other things, forming a "media 'war room' to pushback / defend" with "[a]ggressive counter-narratives offered on-background / off-the-record," executing "[o]pportunistic outreach to inform / contextualize," and launching an "[e]ducation [c]ampaign" that included a "[p]ositive public 'voice' to position [Cardinal Health] as part of solution[.]" The presentation contained no analysis or discussion as to whether Cardinal Health's anti-diversion system was operating effectively.

130. A second Congressional inquiry into the opioid crisis would commence following month. Specifically, on May 9, 2017, the U.S. House of Representatives Energy and Commerce Committee (the "E&C Committee") opened a bipartisan investigation into the distribution of prescription opioids, with a specific focus on unusually large shipments of opioids to small-town pharmacies in West Virginia, requesting information from Cardinal Health and other distributors.

131. In July 2017, Senator McCaskill sought information from Cardinal Health and other distributors, citing concern that DEA action has been "too little, too late," also citing the DEA settlements, press reports, and zeroing in on the role of executive compensation and incentives.

132.    Senator McCaskill asked Cardinal Health questions about its DEA suspensions, suspicious order notifications sent to the DEA, compliance metrics, and executive compensation policies.  There was some overlap in the areas of focus between the McCaskill Letter and the Teamsters letter: both wanted to know how performance-based executive compensation was structured, while noting that during the past four years of a worsening opioid epidemic, the CEO compensation packages just for Cardinal Health, AmerisourceBergen, and McKesson had totaled more than $450 million.  The Books and Records reflect that the directors were aware of the Congressional inquiries into the Company.

133.    Nonetheless, the Board's approach to these matters remained the same: receive reports from the same Company executives who oversaw long-enduring compliance failures and take no action in response to those superficial reports.  The minutes from an August 8, 2017 meeting of the Audit Committee reflect that Mayer reported on the "opioid litigation," while the minutes from an August 8–9, 2017 meeting of the Board shows that the Board discussed "the Company's opioid strategy and response," and "the current opioid litigation landscape and outreach efforts with State Attorneys General," and "media coverage and communications strategies."  These minutes also mention "key focus areas for the Company's anti-diversion program" with no explanation or description of these "focus areas," their purpose, or any program deficiency requiring remediation.

134.    The Books and Records show that the Board received a presentation in August 2017 entitled "Opioid Strategy Update" from Morford and Mayer.  A description contained in the presentation describing the Company's response to the opioid crisis reflects the Board's passivity.  Specifically, a slide titled "What Are We Doing In Response" lists action items such as "Media strategy" ("Monitoring, rapid response and strategic, proactive communications engagement") and

"Prevention Strategy" ("Leveraging and substantially expanding GenRx prevention work"[4]), but makes no mention of the Company's anti-diversion program, CSA compliance efforts, or any effort by the Board to determine whether the Company's anti-diversion program was, in fact, capable of achieving the program's goals. A slide titled "AG Outreach: CAH's Anti-Diversion Program" mentions the Company's program, but provides only broadly worded bullet points without analysis or discussion as to whether these features or the program in general were, in fact, functioning effectively.

135. Fallout from the Company's role in the opioid crisis increased. In October 2017, *The Washington Post* and *60 Minutes* issued additional reports on the efforts of Cardinal Health and others within the prescription opioid supply chain to weaken the DEA and chill the agency's enforcement efforts.

136. Nonetheless, the Board's passivity and lack of action concerning the Company's lack of compliance with CSA requirements continued. The minutes for a November 7, 2017 meeting of the Audit Committee make no mention of the efficacy of the Company's anti-diversion program despite the apparent fact that management had presented an annual compliance report to the committee at this meeting. There is no analysis or discussion as to whether the Company's anti-diversion program was functioning effectively other than a brief reference in an accompanying presentation referencing the Company's positive performance in regulatory inspections.

137. The minutes from a November 8, 2017 meeting of the Board reflect that Morford provided an "Anti-Diversion Update" and talked about recent media stories, and that Mayer

---

[4] Generation Rx is a civic education program concerning opioid abuse started at OSU's College of Pharmacy in 2007 by two pharmacists concerned about the already apparent opioid crisis. Cardinal Health's charitable foundation arm provides funding.

provided updates on opioid litigation, recent investor outreach regarding the epidemic, and the upcoming announcement of Cardinal Health's public-relations and education-focused "Opioid Action Program." An accompanying presentation echoed these topics. As they had been doing since the 2008 Settlement, Company directors took no responsive action and made no effort to determine whether the Company was in compliance with CSA requirements for anti-diversion and suspicious order reporting programs.

138. On December 12, 2017, the U.S. Judicial Panel on Multi-District Litigation entered a Transfer Order centralizing a growing number of pending federal opiate cases into a single, multi-district litigation proceeding in the U.S. District for the Northern District of Ohio captioned *In re National Prescription Opioid Litigation*, MDL No. 2804 (hereinafter referred to as "MDL").

139. As Cardinal Health approached 2018, shareholder, public, and congressional demands for reform and closer monitoring in the Company's anti-diversion program remained unfulfilled. Defendant Barrett stepped back from his dual role as CEO and Chairman but would remain as Chairman of the Board. Defendant Barrett was replaced by Defendant Kaufmann, who became CEO and a director of the Company effective January 2018. Shortly after his appointment, Defendant Kaufmann made remarks in January 2018 at the JP Morgan Healthcare Conference defending the Company's anti-diversion program and asking of himself, "[d]o we feel that we've done all the right things [to control diversion] . . . I do."

140. The Audit Committee and Board next heard about the Company's anti-diversion program was in February 2018. The minutes for a meeting of the Audit Committee held on February 6, 2018, reflect that the committee received an opioid litigation update. Meanwhile, the minutes for a February 6–7, 2018 Board meeting reflect that the Company's outside counsel reminded directors of their fiduciary duties to Cardinal Health "including the directors' duties of

loyalty and care and the Board's duty to exercise oversight of the Company's response to the opioid epidemic," and "provided an overview of the Company's corporate governance in connection with the opioid epidemic, including its existing work streams . . . ."

141.    Finally, following a discussion, the Board took action, resolving to form an ad hoc committee of certain directors to "assist the Board in administering its oversight responsibilities for the Company's response to the opioid epidemic" (previously defined as the "Ad Hoc Committee").  The Board formally established the Ad Hoc Committee by unanimous written consent on February 20, 2018.  The consent states that the committee was formed

> to assist the Board in its duty to engage with senior management and to oversee the Company's response to the nationwide problem of prescription opioid abuse by (1) engaging with and overseeing the Company's senior executives and management regarding the Company's response to that problem and (2) providing advice, regular reports and recommendations to the Board in connection therewith . . . .

142.    The composition of the Ad Hoc Committee inspires no confidence: Defendants Cox, Darden, Downey, and Kenney.  All four are long-standing Cardinal Health directors who have passively received reports concerning the Company's anti-diversion program and, for more than a decade, took no appreciable responsive action.

143.    Meanwhile, the E&C Committee investigation pressed forward.  Approximately one week before the Board formally appointed the Ad Hoc Committee, on February 15, 2018, the E&C Committee sent a second letter to Cardinal Health, and other distributors, requesting additional information the E&C Committee also demanded that Defendant Barrett and high-ranking executives at other companies appear for live testimony on May 8, 2018.

144.    Furthermore, on February 27, 2018, former U.S. Attorney General Jeff Sessions announced the creation of a new effort, the DOJ Prescription Interdiction & Litigation ("PIL") Task Force, to fight the prescription opioid crisis.  A press release announcing the formation of the PIL stated that it would "aggressively deploy and coordinate all available criminal and civil law

enforcement tools to reverse the tide of opioid overdoses in the Unites States, with a particular focus on opioid manufacturer and distributors." The creation of the PIL occurred contemporaneously with the DOJ's filing of a Statement of Interest in the MDL which, according to a separate press release, would "primarily argue that the federal government—through various federal health programs and law enforcement efforts—has borne substantial costs from the opioid epidemic and seeks reimbursement." The Books and Records reflect that the Board was apprised of the PIL Task Force.

145.    Moreover, the Company continued to face pressures from its investors. Specifically, in early 2018, Cardinal Health received a list of corporate governance requests from a coalition of Company shareholders consisting of treasurers, controllers, asset managers, faith-based and labor funds called the Investors for Opioid Accountability ("IOA") seeking numerous changes to the Company's governance practices in connection with the opioid crisis.

146.    Notwithstanding these developments, the Ad Hoc Committee dedicated little to no attention to the efficacy of the Company's anti-diversion program. The minutes from the Ad Hoc Committee's first meeting on March 9, 2018, reflect no discussion of the efficacy of this subject, but rather focuses on topics such as shareholder engagement, "including management's recent meeting with the [IOA] and plans for ongoing engagement," "the current landscape of opioid litigation and . . . MDL resolution meetings," "meetings and discussions between management and certain State Attorneys General," and "recent opioid-related focus and initiatives by the Department of Justice" and "the pending investigation by the House Energy and Commerce Committee," and "state legislative initiatives focused on opioid-related matters." An accompanying presentation lists "Anti-Diversion Program Update" as one of the nine (9) agenda items, but its discussion is completely redacted.

-48-

147. The Ad Hoc Committee next met in April 2018. In what had to be a stunning coincidence within the E&C Committee's investigation, the minutes from the Ad Hoc Committee's April 9, 2018 meeting reflect that Mayer apprised the committee of "management's investigation and analysis of unreported suspicious orders in the Pharmaceutical Distribution business[.]" According to the E&C Committee, management's apparently spontaneous "investigation and analysis" identified *14,131* unreported "suspicious orders" from *2012 to 2018*. However, the Books and Records indicate that management reported a number much lower than that to the Ad Hoc Committee at this time: 9,409. Management informed the Board at an April 11, 2018 meeting of the unreported suspicious order issue. The Company would eventually reveal the unreported suspicious orders to the E&C Committee via letter dated April 25, 2018.

148. The Books and Records show that Company management told directors that unspecified "system errors" caused this CSA compliance violation. To be sure, only the Books and Records pertaining to these April 2018 meetings reveal the Company's apparent reliance on automated reporting of suspicious orders flagged by a computerized database, and that errors in that automated computerized reporting system somehow went unnoticed *since 2012.* These Books and Records also suggest that over at least the 6-year period during which Cardinal Health relied on this automated computerized system for suspicious order reports—when the Company was repeatedly the subject of enforcement and other legal actions pertaining to its suspicious order reporting and anti-diversion systems—no one at Cardinal made any effort until 2018 to investigate and analyze that automated system's reliability and effectiveness.

149. The Books and Records reveal no such efforts by any Company director or officer at any time before April 2018. Even then, the Books and Records show that every director continued the established pattern of passively receiving information at meetings with Company

management and taking no substantive responsive action. Not one director is reported to have questioned any aspect of management's "investigation and analysis" or even asked how these "system errors" could possibly have existed *since 2012* in the wake of the 2008, 2012, and 2016 Settlements and management's repeated historical assurances that it was continuously "enhancing" and "improving" Cardinal Health's compliance systems and processes.

150. On May 8, 2018, Defendant Barrett testified before the E&C Committee. After defending his Company and his role over the past decade, Barrett conceded that, "[w]ith the benefit of hindsight, I wish we had moved faster and asked a different set of questions. I am deeply sorry we did not."

151. The Books and Records reflect that the Ad Hoc Committee also met on May 8, 2018. The minutes from that meeting reflect that Mayer noted the unreported suspicious orders and that the Company requested "agency guidance as to whether those orders should now be reported to DEA."

152. The Books and Records reveal that, after years of recklessly disregarding red flags and aggressively campaigning to weaken the DEA's regulatory capabilities, the Board in mid-2018 was receiving specific information concerning the Company's efforts to gain compliance in its anti-diversion program and suspicious order reporting systems. The minutes from a June 4, 2018 meeting of the Ad Hoc Committee reveal that Mayer "provided an update regarding the status of the unreported suspicious orders matter," including "the request from the [DEA] for additional information relating to management's self-reporting of the unreported suspicious orders, and the Company's response." The Books and Records reflect that the committee received a presentation in connection with this meeting noting that the DEA sent a letter to the Company on May 18, 2018, requesting various pieces of information relating to the unreported orders and that Cardinal Health

had responded to the DEA by letter on June 1st. The presentation also contained "[a]n update on the Company's Suspicious Order Monitoring Program" in its appendix. That update claimed that "[a]s part of the continuous enhancement of Cardinal Health's anti-diversion and regulatory reporting functions, a cross-functional team will review related business, EIT, and audit processes." The presentation further represented that the Company had formed a "Steering Committee" on May 9, 2018—the day after Defendant Barrett's testimony before the E&C Committee—in connection with this project. The Steering Committee was being led by Barber, who had transitioned from the Company's outside counsel to the Company's Senior Vice President, Chief Regulatory Counsel. The Books and Records, however, also indicate that the directors continue to passively receive information from management and take no responsive action.

153. The Books and Records reveal that, after receiving an interim report at a meeting held on July 2, 2018, the Ad Hoc Committee received a fuller update on the unreported orders issue at a meeting held on August 7, 2018. During that period, on July 12, 2018, Senator McCaskill published a report on her investigation titled "Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids Into Missouri and the Need for Stronger DEA Enforcement" (the "Homeland Security Report"). The Homeland Security Report discussed the national prescription opioid picture, but frequently focused on Missouri to provide context and illustrate its points. As alluded to by its title, the Homeland Security Report found that during a five-year period from 2012 to 2017, Cardinal Health, AmerisourceBergen and McKesson shipped over 1.6 billion doses of opioid just to Missouri.

154. According to the Homeland Security Report, Cardinal Health and other distributors had "consistently failed to meet their reporting obligations over the past ten years . . . ." One of

the Homeland Security Report's first findings could not have been surprising: ongoing problems and divergent results with reporting of suspicious orders. The Report also found that Cardinal Health actually reported to the DEA only 1,266 of a total of 5,125 suspicious orders it told Congress it had reported during that period. Furthermore, Cardinal Health was also able to provide only scant details to the Homeland Security Committee concerning its due-diligence of existing pharmacy customers.

155. The minutes for the Ad Hoc Committee's meeting on August 7, 2018, reveal that it received an update from Morford on, among other things, the Homeland Security Report, as well as an expected report from the E&C Committee. The minutes also reflect that Barber and other Cardinal Health executives made a presentation concerning the Company's anti-diversion program. Barber provided an update on recent meetings with the DEA, noting the "DEA representatives' indication that the DEA has no significant concerns regarding the [unreported suspicious orders] issue." Barber and other Cardinal Health executives gave generalized reports on "the work of the management [S]teering [C]ommittee that is focused on the Company's review of relevant standard operating procedures and IT systems," "IT system capabilities and enhancements," "ongoing enhancements to the Company's Suspicious Order Monitoring Program," and "ongoing related internal audit processes," among other topics. The Books and Records reflect that the Board received a similar update at its meeting on August 8, 2018. The Books and Records also reflect that the Audit Committee received another boiler-plated "Enterprise Risk Tracking List" update on anti-diversion at its meeting held on August 7, 2018. Again, the Books and Records indicate that the directors continued to passively receive information from management and take no responsive action.

156.    The Books and Records reflect that the Ad Hoc Committee continued to receive reports concerning the Company's anti-diversion program in the wake of Barber's report on the unreported suspicious order issue.  The minutes from a September 18, 2018 meeting of the Ad Hoc Committee state that Morford "provided an update on the Company's suspicious order monitoring programs."  The Books and Records reflect that the Ad Hoc Committee received a presentation in connection with this meeting that dedicated one slide to the Company's "Suspicious Order Monitoring Program" with generalized updates that "EIT upgrades and modifications functioning properly," "Steering Committee continues work to evaluate current state of all controlled substance federal and state reporting requirements and CAH systems used to make reports," including purported "[o]rganizational changes underway to bring all suspicious order monitoring functions for all business units under [Cardinal Health Senior Vice President, Supply Chain Integrity] Todd Cameron's Anti-Diversion team."    The Books and Records reveal that the Board, Audit Committee, and Ad Hoc Committee received similarly brief updates on the Company's anti-diversion program at their meetings in early November 2018 meeting.

157.    On December 19, 2018, the E&C Committee issued a report from its investigation titled "Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia" (the "E&C Report").  Just as the Homeland Security Report put the spotlight on Missouri to provide context and illustrate its points, the E&C Report focused on West Virginia.  The E&C Report found that, despite entering into settlement agreements with the Food and Drug Administration, and purported policy enhancements that distributors, including Cardinal Health, made in their aftermath, these distributors continued to ship excessive amounts of opioids into the state.  According to the E&C Report, Cardinal Health and other distributors shipped more than

900 million doses of prescription opioids to West Virginia between 2005 and 2016, with Cardinal Health shipping the most, more than 366 million doses.

158.    The E&C Report identifies multiple deficiencies in the Company's anti-diversion program.  The report notes that, although Cardinal Health agreed to implement a two-person review process for large controlled substances purchases as part of the 2012 Settlement, "the first [Standard Operating Procedure ("SOP")] policy identified by the [E&C] Committee that explicitly outlines that requirement was issued in *2016*."  According to the E&C Report, Cardinal Health had only enlisted this two-person review process implemented in connection with the 2012 Settlement for some, but not all, controlled substances, but had represented to the E&C Committee that it now required such a process for all controlled substance families once they reach certain threshold levels.

159.    The E&C Report also contained a case study on the Company's distribution threshold practices concerning the Hurley Drug Company ("Hurley") located in the town of Williamson, West Virginia (population 3,191).  The E&C Report noted that, from 2006 to 2016, Hurley received more than 10.58 million doses of hydrocodone and oxycodone from wholesale distributors, with Cardinal Health accounting for one-third of that supply.  The E&C Report noted that Cardinal Health maintained very high distribution thresholds for Hurley, a practice which prevented the pharmacy from being subject to Company investigation.  The E&C Report also noted that Cardinal Health failed to account for Hurley's actual dispensing data in setting these thresholds.  In a case study regarding Family Discount Pharmacy ("Family Discount") in Mount Gay-Shamrock, population 1,779, the E&C Report found that, for the various threshold adjustments the Company made to Family Discount, "Cardinal [Health] did not consistently document the reason for each threshold adjustment nor does it appear to have applied the same

level of scrutiny to each threshold increase." Thus, the E&C Report found: "Because the same level of documentation was not kept for all threshold adjustments, it is unclear what factors were taken into consideration prior to some hydrocodone threshold increases for Family Discount. It is also unclear, at times, whether Cardinal verified explanations provided by Family Discount regarding its increased hydrocodone dispensing."

160.    The E&C Report also contained critiques of the Company's new customer onboarding process. According to the E&C Report, "Cardinal Health does not appear to require prospective customers to provide dispensing data as part of their application, unless specifically requested to do so by the [C]ompany."

161.    The Books and Records reflect that the Ad Hoc Committee also met on December 19, 2018. According the minutes of that meeting, the Ad Hoc Committee received an update from Morford on the issuance of the E&C Report and that Defendant Downey referred the committee to pre-read materials concerning the Company's anti-diversion program, "including the work of the management [S]teering [C]ommittee[.]" The minutes also reflect that Mayer provided an update "regarding a recent settlement of a California Board of Pharmacy disciplinary matter against the Company's Valencia, California distribution center relating to the theft of controlled substances from a customer by one of its employees." The Books and Records contain a presentation dedicating one slide to the Company's "Controlled Substances Compliance Program" that provides a generalized update on this program with no level of specificity or detail.

162.    The Books and Records reflect that the Ad Hoc Committee next met on February 5, 2019. In addition to its routine updates on the opioid litigation and shareholder engagement, among other matters, the minutes from this meeting reflect that Barber and Cardinal Health Senior Vice President, Supply Chain Integrity Todd Cameron discussed the E&C Report, "noting

management's observations with respect to the contents of that report," and that, after discussion, the Committee "directed management to continue its approach regarding the anti-diversion program continual improvement process[.]" The Books and Records reflect that the Ad Hoc Committee received a presentation dedicating two slides to the Company's "Controlled Substances Compliance Program." The presentation once again only describes the Steering Committee's activities in broad strokes. The presentation discusses "[k]ey observations from the E&C Report," and that the report "[m]ade 25 findings about the role and conduct of five distributors," including the Company, but this discussion is largely redacted.

F.     **The Public Record Reveals Pervasive, Ongoing Failures in the Company's Anti-Diversion Program**

163.   Given the heavy redactions contained in the Books and Records, as well as the highly-general updates provided to the Individual Defendants as reported in the Books and Records, it is unclear what the Individual Defendants have specifically done and are currently doing to rectify the deficiencies in the Company's anti-diversion and suspicious order monitoring programs. The last Ad Hoc Committee meeting minutes in the Books and Records are from a meeting held on March 22, 2019, wherein Mayer generally "provided an update regarding the Company's controlled substances compliance program . . . including the ongoing work of the management [S]teering [C]ommittee," and noted "management's plans to update the [Ad Hoc] Committee in May regarding, among other things, [PRIVILEGE], the [DEA's] provision of ARCOS[5] data access to distributors and the impact of a new Ohio rule regarding distributions of

---

[5] ARCOS is an acronym for the DEA's Automation of Reports and Consolidated Orders System. According to the DEA, "ARCOS is an automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level - hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions." Further, "ARCOS accumulates these transactions which are then summarized into reports which

controlled substances." The Books and Records reflect that the Ad Hoc Committee received a presentation in connection with this meeting with one slide dedicated to the Company's anti-diversion program. Aside from mentioning that Barber would provide an "Anti-Diversion / EIT Steering Committee Update" on topics such as "EIT projects," "Anti-diversion SOP projects," and "Internal Audit projects," and "ARCOS Data Access," the slide contains a sub-title for "Potential Enhancements and Modifications to Anti-Diversion Program (E&C Report follow-up discussion)" for which the entire discussion is wholly redacted.

164. It is also unclear what, if anything, the Audit Committee and Board are doing to remediate the Company's anti-diversion and suspicious order monitoring programs. The Books and Records reveal that the Board and Audit Committee may have received presentations and related materials in May 2019 that merely included, among other things, generalized risk and litigation updates.

165. Nonetheless, the public record reveals that Cardinal Health continues to suffer from pervasive failures in its anti-diversion and suspicious order monitoring programs. The Books and Records reveal a Board comprised of directors who have shown a historical pattern of passively receiving reports from Company management and taking no responsive action. Even the Ad Hoc Committee, while showing considerably more engagement than the Audit Committee had historically exhibited concerning the Company's anti-diversion and suspicious order reporting systems, has shown a continued pattern of receiving communications from management and endorsing management's conclusions and proposals, with little-to-no pushback or modifications from the directors.

---

give investigators in Federal and state government agencies information which can then be used to identify the diversion of controlled substances into illicit channels of distribution."

166. The Books and Records do not show that directors are actively monitoring the effectiveness of Cardinal Health's suspicious order reporting and anti-diversion systems, as their fiduciary duties require. The absence of such information from the Books and Records suggests the Board continues to engage passively with Company management concerning CSA compliance matters.

167. Meanwhile additional reports of historical CSA compliance failures continued to come to light. For example, on May 10, 2019, the California Board of Pharmacy filed a First Amended Accusation against Cardinal Health alleging that the Company, through its subsidiary, ParMed, distributed controlled substances to a dead pharmacist and that, before and after the death of this pharmacist, shipped substances to various non-pharmacists in violation of California law.

168. Thereafter, on March 28, 2019, the New York Attorney General issued a press release announcing that it had "filed the nation's most extensive lawsuit against the manufacturers . . . and distributors of opioids for their role in the opioid epidemic" through a First Amended Complaint in the matter captioned *New York v. Purdue Pharma, L.P., et al.* (the "NY AG Complaint"). The NY AG Complaint alleged that, from 2010 through 2018, Cardinal Health, acting primarily through ParMed and Kinray, was the largest distributor in the State of New York during this time period, distributing nearly 780 million oxycodone pills to customers in the state.

169. In a section titled "Cardinal's Flawed Written Policies Enabled Opioid Diversion," the NY AG Complaint alleges that the Company's written policies for compliance with New York's analog to the CSA (i.e., Cardinal Health's Standard Operating Procedures, or "SOPs") "were fundamentally flawed in that they were not coordinated within the context of a consistent, unified umbrella policy to prevent the diversion of controlled substances, resulting in employees governed by one of the SOPs being unaware of the obligations imposed by other SOPs on other

employees, even when effective anti-diversion measures required that understanding and coordination." The NY AG Complaint further alleges that the SOPs and other Company policies "contained numerous gaps that would have prevented them from effectively preventing diversion, even if enforced."

170. The NY AG Complaint further alleges that, "[a]t all relevant times, Cardinal failed to employ qualified compliance staff to implement these policies, failed to adequately train those compliance staff or its sales representatives concerning Cardinal's anti-diversion duties, and failed to enforce even the defective policies it had in place."

171. The NY AG Complaint alleges that in 2012 and 2013—contemporaneous with or immediately subsequent to the 2012 Settlement "Cardinal took significant steps to renew focus on increased sales at the cost of a robust and responsible compliance structure, thereby keeping as customers pharmacies that it knew or should have known were high risk for diversion of opioids."

172. The NY AG Complaint further alleges that "as to existing customers, Cardinal routinely failed to follow the SOP's procedures for detecting, monitoring, and reporting suspicious orders." Specifically, the NY AG Complaint alleges that "Cardinal's compliance staff routinely released orders in excess of a customer's threshold without conducting the follow-up investigation and providing the detailed written justification called for by SOPs," and "[e]ven in instances where Cardinal's staff made a notation indicating that some kind of follow-up investigation would be required—for example, a request to discuss because an investigator suspected 'an unethical practice'—the orders in question were released immediately, before any such investigation could possibly have been concluded." Moreover, the NY AG Complaint alleges that, "in several instances, occurring at least as recently as 2017, Cardinal simply filled orders in excess of

customers' thresholds without those orders having been detected, held, or triggered for review at all, as required by the relevant SOP."

173.   The NY AG Complaint also contains startling allegations about two of the Company's subsidiaries, ParMed and Kinray.  Among other things, the NY AG Complaint reveals that the Audit Committee and Board utterly failed to integrate these two entities into the Company's anti-diversion program:

174.   Cardinal Health's acquisitions of ParMed and Kinray led to substantial additional violations.  Cardinal took on these new subsidiaries' customers despite their deficient new customer screening, conflicting policies, and faulty anti-diversion measures.  The integration process itself also created gaps that allowed controlled substances to process through the system without adhering to Cardinal's suspicious order monitoring policies.  In short, these recent allegations demonstrate pervasive and ongoing flaws in the Company's anti-diversion program.

### G.   The Individual Defendants Have Caused Significant Harm to Cardinal Health

175.   The breaches of fiduciary duty by the Individual Defendants occurring over the past decade have exposed and will continue to expose the Company to potentially ***billions of dollars*** in losses, expenses, and reputational harm, a staggering figure for a company such as Cardinal Health with a market capitalization of approximately $16 billion.

176.   The misconduct of the Individual Defendants has already caused the Company to enter into the 2008 Settlement, the 2012 Settlement, and the 2016 Settlement.  All told, these settlements have cost the Company $78 million dollars in civil penalties.

177.   In addition, the Company has already paid out almost $100 million dollars to settle lawsuits and faces ***billions of dollars*** in potential liability exposure to settle ongoing claims.  In addition to the $20 million settlement with the West Virginia Attorney General in early 2017,

Cardinal Health agreed in October 2019 to settle claims brought by two bellwether plaintiffs in the MDL on the eve of trial for $66 million.

178. Concurrently, with the MDL, the Company is the target of an investigation being conducted by a task force comprised of forty-four state attorneys general and state political subdivisions. According to news reports, Cardinal Health, McKesson, and AmerisourceBergen offered the attorneys general to settle claims against them for $10 billion to which the state attorneys general countered at $45 billion. In October 2019, Cardinal Health disclosed that it had agreed in principle to a global settlement framework with a leadership group of four state attorneys general from the multi-state task force that is designed to resolve all pending and future opioid lawsuits and claims by states and political subdivisions, but not private plaintiffs (the "Settlement Framework"). The Settlement Framework includes, among other things, a cash component pursuant to which the Company would pay up to *$5.56 billion* over eighteen years.

179. To be sure, any truly global resolution would have to include the almost 2,000 additional lawsuits brought by U.S. cities and counties which comprise the MDL, who may or may not elect to join any settlement between Cardinal Health and the multi-state task force. Analysts have estimated a truly global settlement would cost as much as $100 billion.

180. Furthermore, the Compensation Committee has and continues to unjustifiably overcompensate Individual Defendants Barrett and Kaufmann, and other Cardinal Health executives, while failing to consider the financial and reputational damage that they have caused the Company. From 2008 to 2017, the Compensation Committee has awarded Defendant Barrett and Kaufmann, and other Cardinal Health executives over $183 million in unwarranted and excessive compensation notwithstanding these executives' failure to ensure that the Company was operated in a legal manner and maintained an effective anti-diversion program.

181.    Furthermore, the Company has incurred hundreds of millions of costs stemming from, among other things, (i) legal fees relating to civil litigation, and congressional and regulatory investigations; (ii) increased compliance costs; and (iii) significant lobbying costs aimed at reducing the influence of regulatory entities investigating the Board and senior management's misconduct and public relations costs aimed at deflecting the same.

## V.    DEMAND ON THE BOARD WOULD BE FUTILE

182.    Plaintiff brings this action derivatively in the right and for the benefit of Cardinal Health to correct the breaches of fiduciary duty by the Individual Defendants.

183.    Plaintiff will adequately and fairly represent the interests of Cardinal Health and its shareholders in enforcing and prosecuting this type of action.

184.    The Board presently consists of the following twelve (12) directors: Arnold, Cox, Darden, Downey, Hemingway Hall, Johri, Kaufmann, Kenney, Killefer, Losh, Scarborough, and Weiland.  Notably, three directors have served on the Board since before the 2008 Settlement—Arnold, Darden, and Kenny—and a fourth, Losh, served on the Board from 1996 until 2009—that is, one year after the 2008 Settlement.  A fifth and sixth have served on the Board since before the 2012 Settlement: Cox and Downey.  A seventh and eighth have served on the Board before the 2016 Settlement: Hemingway Hall and Killefer.  And a ninth director, Kaufmann, is currently Cardinal Health's CEO and served in various executive capacities at Cardinal Health since at least 2008, when he became CEO of the Company's Pharmaceutical Segment, the same segment through which the Company has distributed its prescription opioids to the masses.

185.    Plaintiff did not make a demand on the Board prior to initiating this action because such a demand would have been a futile, wasteful and useless act because a majority of the Board would have been "interested" in (and therefore conflicted from and unable to fairly consider) a

demand because they face a substantial likelihood of liability for their role in Cardinal Health's improper misconduct.

186.    This case implicates the Board's facilitation of unlawful activity, including knowingly and consciously presiding over the Company's systematic violations of the CSA and state analogs.  The Board implemented and oversaw a business strategy that resulted in widespread and repeated violations of the law.  Breaking the law, and breaching agreements with the DEA, is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

187.    Demand is also excused because the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.  A majority of the Board served as directors of the Company during some or all of the wrongdoing alleged herein, and each of the Individual Defendants knew of the wrongdoing but failed to act in the face of a known duty to act.  For these reasons, a majority of the Board faces a substantial likelihood of liability for their participation in the illicit acts.

188.    The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law can only have been a result of knowing breaches or reckless disregard for one's fiduciary duties.  Despite being aware of the Company's prior misconduct concerning improperly reporting suspicious orders of controlled substances and failing to maintain an effective anti-diversion program, the Individual Defendants failed to take appropriate remedial action and that failure to take any action resulted in substantial corporate losses.  For these reasons, the decisions to not act was not made in good faith and was contrary to the best interests of the Company.  All of the Individual Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight.  Moreover, the Books and Records shows that they devoted

patently inadequate time or consciously disregarded compliance with the controlled substance laws in general, and the 2008 and 2012 Settlements in particular.

189.    Defendant Kaufmann is the President and CEO of Cardinal Health, and in that capacity, he receives substantial monetary compensation and other benefits.  Cardinal Health admits in its annual proxy statement filed with the SEC on September 20, 2019, and other public filings that Kaufmann is not independent.  Kaufmann thus lacks independence, rendering him incapable of impartially considering a shareholder demand to commence and vigorously prosecute this action.

190.    Arnold, Cox, Downey, and Hemingway Hall are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee.  These individuals have served on the Audit Committee at various time from 2008 through the present.  As set forth above, the Audit Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations and internal policies.  These individuals violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

191.    As alleged herein and based on the duties imposed pursuant to the Company's corporate governance documents and applicable federal and state law, the Individual Defendants were aware of indicators and warnings that necessarily informed them of the legal violations taking place within the Company.  Notwithstanding these warnings, the Individual Defendants wholly failed to provide oversight for years.  Given the duties placed on the Board, to the extent any of the Individual Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within the Company, and the nationwide opioid

epidemic and state and federal lawmakers' focus on regulation, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith breaches of their duties.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

192.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

193.    The Individual Defendants all owed and owe fiduciary duties to Cardinal Health. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Cardinal Health the highest obligation of good faith and loyalty in the administration of the affairs of Cardinal Health, including assuring that the Company complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Cardinal Health alleged herein.

194.    The Individual Defendants also had a duty to develop and implement a proper functioning anti-diversion program, which Cardinal Health agreed to put in place in connection with the 2008 and 2012 Settlements to ensure that the Company complied with federal law in reporting suspicious orders of controlled substances. The Individual Defendants also had a duty to comply with analogous state laws.

195.    The Individual Defendants willfully and/or recklessly ignored their obligations under federal and state law, Cardinal Health's internal controls and numerous warnings and government investigations and inquiries specifically relating to failure to report suspicious orders

and/or maintain an effective anti-diversion program.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

196.    The Individual Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent Cardinal Health from failing to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels after receiving numerous warnings and indicators, including multiple prior government investigations and fines in connection with the Company's failure to comply with the CSA and state analogs.  The Individual Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that Cardinal Health complied with its affirmative duty to implement and comply with applicable law.

197.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Cardinal Health in a manner consistent with the duties imposed upon them by law.

198.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and loyalty in the management and administration of Cardinal Health's affairs and in the use and preservation of the Company's assets.

199.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Cardinal Health has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages includes, among other things, the substantial penalties, fines, sales suspension and expenses described herein.

200.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**

**AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS**

201.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

202.    By their actions alleged above, and by failing to properly consider the interests of Cardinal Health and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused the Company to waste valuable corporate assets by paying improper compensation and bonuses to liability or legal costs to defend the Individual Defendants' unlawful actions.

203.    As a result of the waste of corporate assets, Cardinal Health has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand on the Board is excused;

B.    Awarding against all Individual Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

C.    Awarding to Cardinal Health restitution from the Individual Defendants, and ordering disgorgement of all unjust profits, benefits, and other compensation obtained by Individual Defendants;

D.    Ordering Cardinal Health to take all necessary actions to reform and improve its corporate governance and internal processes to comply with the Company's

governance obligations, and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events contained in this Complaint;

      E.    Awarding to Plaintiff the cost and disbursements of the action, including reasonable attorney's fees, experts' fees, accountant fees, costs, and expenses; and

      F.    Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims asserted herein.

Dated: January 13, 2020          Respectfully submitted,

**ISAAC WILES BURKHOLDER & TEETOR, LLC**

s/ Mark H. Troutman
Mark H. Troutman (0076390), Trial Attorney
Shawn K. Judge (0069493)
Two Miranova Place, Suite 700
Columbus, Ohio 43215–5098
Phone: (614) 221–2121
Facsimile: (614) 365–9516
mtroutman@isaacwiles.com
sjudge@isaacwiles.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Eric L. Zagar (*Pro Hac Vice forthcoming*)
Michael C. Wagner (*Pro Hac Vice forthcoming*)
Christopher M. Windover (*Pro Hac Vice forthcoming*)
280 King of Prussia Road
Radnor, Pennsylvania 19087
Phone: (610) 667–7706
Facsimile: (610) 667–7056
ezagar@ktmc.com
mwagner@ktmc.com
cwindover@ktmc.com

*Attorneys for Plaintiff Michael Splaine*